321 Ga. 771
FINAL COPY

S25A0362. REPUBLICAN NATIONAL COMMITTEE et al. v.
ETERNAL VIGILANCE ACTION, INC. et al.
S25A0490. STATE OF GEORGIA v. ETERNAL VIGILANCE
ACTION, INC. et al.

PETERSON, Chief Justice.

This is a case about all three kinds of government power: legislative, executive, and judicial. Everyone agrees that the *legislative* power that the Georgia Constitution vests in the General Assembly includes the power to make rules for elections. But the General Assembly did not make the seven rules that are challenged in this case; instead, an agency vested with only *executive* power — the State Elections Board (the "SEB") — did. So this is a case about whether and to what extent the General Assembly can and did authorize the SEB to make those seven rules. And this is also a case about whether the plaintiffs (some individuals and some organizations) that have challenged those rules can invoke the *judicial* power that the Georgia Constitution vests in Georgia courts

to decide their claims.

We must decide that last issue first. We reiterate once again that the Georgia Constitution allows us to decide only claims brought by parties who have asserted that their own rights have been violated. The organizational plaintiffs have not asserted the violation of any of their own rights (at least of the sort that count for standing), and so we cannot consider any of the claims that they have brought, and we overrule any inconsistent precedent that might have survived our previous course corrections. Our judicial power now properly understood, we have the authority and responsibility to consider the claims that the individual plaintiffs have brought challenging five of the seven rules because those rules threaten those individuals' private right to vote. The voters do not have standing as voters to challenge the remaining two rules. One of the voters is also a member of the Chatham County Board of Elections, however, and asserts that he has standing to challenge these two rules by virtue of his position and possibility of personal harm if he fails to conduct the elections lawfully and properly, which

he argues cannot be done since the challenged rules conflict with the Election Code. But because the issue of this individual's standing as an election board member presents several novel and difficult questions that the trial court has not yet considered, we vacate and remand on that issue.

Once we reach the merits of the five rules that remain for our present consideration, we immediately recognize that *Dept. of Transp. v. City of Atlanta*, 260 Ga. 699 (398 SE2d 567) (1990) ("*DOT*"), if we applied it, would lead us to uphold all of the challenged rules. But that case has always been an extreme outlier among our many other cases about to what extent — if any — the General Assembly can delegate its legislative power to other branches (the "nondelegation doctrine"). We conclude that *DOT* was wrongly decided, and we overrule it. The long-standing Georgia legal standard that we reinstate leads us to conclude that only one of the five rules survives (a rule requiring video surveillance of drop boxes following the close of polls each day); the other four rules are invalid. We therefore affirm in part, reverse in part, vacate in part and

3

remand with direction.

1. *Background.*

The General Assembly created the SEB in 1964 as part of a comprehensive effort to regulate federal, state, and county elections. See Ga. L. 1964, Ex. Sess., p. 26 (preamble). Initially, the General Assembly gave the SEB the authority to "formulate, adopt and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal and orderly conduct of elections[.]" See id., p. 35, § 1 (now OCGA § 21-2-31 (2)). Over time, the General Assembly gave the SEB additional rulemaking authority. In addition to the rulemaking authority under OCGA § 21-2-31 (2), the General Assembly has since given the SEB the authority to, among other things, define standards as to "what constitutes a vote and what will be counted as a vote," OCGA § 21-2-31 (7),[1] and the authority "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well

---

[1] See Ga. L. 2003, p. 519, § 2.

as the legality and purity in all primaries and elections[,]" OCGA § 21-2-31 (1).[2] These three sources of rulemaking authority are implicated in this case.[3]

In August 2024, the SEB adopted several rules in advance of the November 2024 general election. In response, several plaintiffs — Eternal Vigilance Action, Inc. ("EVA"), a Georgia domestic nonprofit corporation that focuses on election policy and defends "the institution of elections from attacks that erode public faith in electoral outcomes"; one of the group's members and its Executive Director, Scot Turner; and James Hall (collectively, "the Plaintiffs") — filed suit against the State, seeking (1) a declaration that the rules were unconstitutional and contrary to the Election Code and (2) injunctive relief to prevent their application. See Ga. Const. of 1983, Art. I, Sec. II, Par. V (b) (1) ("Paragraph V") (waiving sovereign

---

[2] See Ga. L. 2008, p. 782, § 2.

[3] The Georgia Code also provides that the SEB may "take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." OCGA § 21-2-31 (10). But the State did not rely on this provision as providing the SEB with the authority to issue the rules at issue in this case.

5

immunity to allow suits seeking a declaration that the "acts of the state or any agency, authority, branch, board, bureau, commission, department, office, or public corporation of this state" are "outside the scope of lawful authority or in violation of the laws or the Constitution of this state or the Constitution of the United States[,]" and allowing a court to enjoin such acts upon granting declaratory relief). Turner and Hall asserted standing as Georgia citizens, registered voters, and taxpayers, while EVA asserted organizational standing. In their sworn declarations, Turner and Hall said that as voters, they were uncertain regarding the method by which they would vote in the general election given the challenged SEB rules. Hall is a member of the Chatham County Board of Elections and stated that he was not sure as an election official whether to follow the Election Code or the challenged rules, that he was "uncertain how to direct the election officials to act in Chatham County to ensure a consistent and legitimate election process[,]" and that he was concerned he would face legal consequences for his decisions.

Soon after the complaint was filed, the SEB adopted additional

6

rules that the Plaintiffs then also challenged. In all, there are seven SEB rules at issue that are either entirely new rules or amendments to existing rules. Those seven rules, which will be discussed in more detail later, provide briefly as follows:

1. That county election boards conduct a "reasonable inquiry" before certifying the results of an election. Ga. Comp. R. & Regs., r. 183-1-12-.02 (1) (c.2) (the "Reasonable Inquiry Rule").

2. That election board members are permitted to examine all election-related documentation before certifying results. Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (.1) (6) (the "Examination Rule").

3. That precinct workers count ballots by hand after the close of the polls. Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (5) (the "Hand Count Rule").

4. That the total number of votes, as well as the specific number of early and absentee voters, be reported daily and made available on a website or in a public place

accessible 24 hours a day to the public. Ga. Comp. R. & Regs., r. 183-1-12-.21 (the "Daily Reporting Rule").

5. That poll watchers be allowed access to an expanded list of areas where the tabulation of votes takes place. Ga. Comp. R. & Regs., r. 183-1-13-.05 (the "Poll Watcher Rule").

6. That family members or caregivers provide photo identification when dropping off an absentee ballot of another voter at certain ballot drop-off locations. Ga. Comp. R. & Regs., r. 183-1-14-.02 (18) (the "Drop Box ID Rule").

7. That absentee drop boxes at early voting locations be under video surveillance outside of voting hours. Ga. Comp. R. & Regs., r. 183-1-14-.02 (19) (the "Drop Box Surveillance Rule").

The Georgia State Conference of the NAACP ("Georgia NAACP") and the Georgia Coalition for the People's Agenda, Inc. ("GCPA"), intervened as plaintiffs (collectively, "Plaintiff-

Intervenors") seeking to challenge only the Hand Count Rule, and they asserted organizational and associational standing. The Republican National Committee and the Georgia Republican Party intervened as defendants (collectively, "Defendant-Intervenors").

Following a hearing, the trial court granted relief to the Plaintiffs. It found that they had standing to bring their claims;[4] the challenged rules were not authorized by any provision of the Election Code and were contrary to it; the challenged rules violated the nondelegation doctrine because there were no guidelines constraining the SEB's actions; and the rules violated the Elections Clause of the federal Constitution because they were not promulgated by the General Assembly. The Defendant-Intervenors filed emergency motions seeking expedited review. Noting that we lacked jurisdiction over cases involving challenges to the constitutionality of administrative rules and regulations, we nonetheless granted certiorari before judgment as to the emergency

---

[4] The trial court did not specifically address the standing of Plaintiff-Intervenors.

motion and appeal because the appeal presented "issues of gravity and public importance." After consideration, we denied the Defendant-Intervenors' motion for expedited review and for supersedeas. As a result, the rules were enjoined during the November 2024 election. This appeal followed in the ordinary course.

2. *Standing*.

The State argues that the trial court erred in concluding that the Plaintiffs have standing to challenge the seven rules at issue. We agree in part and disagree in part and also conclude that the Plaintiff-Intervenors lack standing.

Under the Judicial Power Paragraph of the Georgia Constitution, see Ga. Const. of 1983, Art. VI, Sec. I, Par. I, Georgia courts have the power to resolve only genuine controversies. See *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39, 50 (2) (b) (880 SE2d 168) (2022) ("*SCV*"). For a genuine controversy to exist, and thereby invoke the State's judicial power, a plaintiff must have standing to sue. Id. at 44-45 (2) (a), 50 (2) (b).

10

This is a jurisdictional requirement, mandating that a plaintiff show that he has a legal "right at stake that requires adjudication to protect it." Id. at 44-45 (2) (a), 51 (2) (b). As the party seeking to invoke the jurisdiction of a Georgia court, the plaintiff has the burden of establishing standing. See *Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 381 (1) (870 SE2d 430) (2022) ("*BVMF*"). A plaintiff must assert the violation of his *own* rights and cannot merely vindicate the rights of another. See *Wasserman v. Franklin County*, 320 Ga. 624, 640 (II) (A) (2) (911 SE2d 583) (2025) ("The requirement that a plaintiff must assert a violation of her rights to maintain an action in Georgia courts is . . . the bedrock requirement for invoking the judicial power granted by the Georgia Constitution.").

Standing must be established as to each claim of relief sought. See *Williams v. DeKalb County*, 308 Ga. 265, 271 (3) (840 SE2d 423) (2020). Although the Plaintiffs generally sought declaratory relief, they sought relief as to seven different rules, so standing must be established as to each rule. We first address whether the

11

organizational plaintiffs have organizational or associational standing, then consider whether all the plaintiffs have community-stakeholder standing to assert violations of community rights, and then move to whether the individual plaintiffs have standing as voters to challenge violations of their individual rights to vote.

(a) *No organization has standing to challenge the rules under a diversion of resources theory considered in* BVMF.

The trial court ruled that EVA had organizational standing. According to the plaintiff organizations — EVA, Georgia NAACP, and GCPA — their organizations' standing was established under a "diversion of resources" theory discussed in *BVMF*. EVA argues that it had to spend time and redirect resources analyzing different measures to attempt to correct any negative effects resulting from the SEB rules, while the Georgia NAACP and GCPA argue that their work to register and mobilize voters would be undone by the Hand Count Rule. In other words, the plaintiff organizations argue that drawing resources away from their core business to deal with

the SEB rules is sufficient to establish organizational standing. That is not — and has never been — sufficient as a matter of Georgia law.

In *BVMF*, this Court considered an argument asserting a standing theory novel to Georgia: a "diversion of resources" theory found in some federal cases. This theory was based on a United States Supreme Court case determining that an organization suffers an injury in fact under Article III of the United States Constitution when it devotes significant resources to identify and counteract the defendant's actions. *BVMF*, 313 Ga. at 384 (1) (a) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (102 SCt 1114, 71 LE2d 214) (1982)). After assuming without deciding that this theory applied under Georgia law, we discussed the different applications in federal cases and ultimately concluded that the broad theory the plaintiffs relied upon in *BVMF* was inconsistent with the federal injury-in-fact requirement that we had recently and uncritically imported into our standing caselaw. *BVMF*, 313 Ga. at 386-387 (1) (a). Accordingly, we concluded that the plaintiffs failed to show standing. See id. at 387 (1) (a).

We have since recognized that our importation of federal injury-in-fact requirements was not consistent with Georgia standing law. After *BVMF* was decided, we engaged in a more rigorous analysis of our standing doctrine in *SCV* and *Wasserman,* rejecting "federal standing doctrine as a proper source of rules of constitutional standing in favor of our own Constitution." *Wasserman*, 320 Ga. at 627 (II); see also *SCV*, 315 Ga. at 45 (2) (a) ("[N]othing in the Georgia Constitution requires that we follow federal law on standing, even though in our more recent history, this Court has uncritically adopted federal jurisprudence on the question of standing."). In our review of the original public meaning of the Judicial Power Paragraph of the Georgia Constitution as it applied to standing doctrine, our historical precedent revealed the bedrock principle that an individual must assert the violation of his own rights in order to invoke the judicial power of Georgia courts. See *Wasserman*, 320 Ga. at 638-639 (II) (A) (1) (b); *SCV*, 315 Ga. at 62 (2) (c) (iii).

As we observed in *Wasserman*, federal standing rules had long been similar to Georgia rules, focusing on the violation of a legal right, before federal jurisprudence departed from that original understanding and imposed an injury-in-fact standing requirement that could be satisfied merely by showing real-world damage or harm from the defendant's actions — a requirement that does not necessarily depend on a violation of one's own legal rights. *Wasserman*, 320 Ga. at 639-640 (II) (A) (2). Although Georgia courts briefly borrowed this theory uncritically, *SCV* and *Wasserman* were course corrections, returning our inquiry into the scope of the judicial power to its proper focus on vindicating the legal rights of the parties, rather than on addressing mere factual harms. Id. at 638-639 (II) (A) (1) (b).

Here, the plaintiff organizations maintain that *BVMF*'s organizational standing requirements were not disrupted by *Wasserman* or *SCV*. That is partly true; an organization does have standing "in its own right if it meets the same standing test applicable to individuals." *BVMF*, 313 Ga. at 382 (1) (a). And that

Georgia test — now properly understood — is centered on the violation of a legal right, not a factual harm. *Wasserman*, 320 Ga. at 638-640 (2). But because *BVMF* merely assumed without deciding that standing might be based on a diversion of resources theory as a predicate to rejecting standing in that case, it was not a holding that the diversion of resources theory is properly part of Georgia's standing doctrine. See *Rabun County Bd. of Ed. v. Randel*, 361 Ga. App. 323, 326 (1) (864 SE2d 160) (2021) (noting that previous opinion that assumed point without deciding it did not preclude holding the opposite). More importantly, *SCV* and *Wasserman* have made clear that a theory based solely on factual harms without any grounding in a plaintiff's own rights has no place in our standing doctrine, and thus a diversion of resources theory divorced from a showing of a violation of an organization's legal rights cannot establish organizational standing. Because none of the organizations alleged, much less proved, that the SEB rules violated

16

any of the organizations' own private rights, they do not have organizational standing.[5]

(b) *Neither Georgia NAACP nor GCPA has associational standing.*

Georgia NAACP and GCPA argue that they have associational standing to assert the voting rights of their members. We disagree.

Associational standing is essentially a less-demanding version of third-party standing, permitting a plaintiff to sue to vindicate the rights of someone else, even if the plaintiff has suffered no injury.

---

[5] We have said that a litigant has the burden of proving standing where it is disputed and have dismissed an appeal where the litigant did not establish standing with competent evidence at trial. See *Sherman v. City of Atlanta*, 293 Ga. 169 (744 SE2d 689) (2013). And we have held that allegations in a complaint can be enough to survive a standing challenge at the motion to dismiss stage. See *SCV*, 315 Ga. at 63 (2) (c) (iii), 65 (2) (d) (i). These cases suggest that "proof" of standing depends on the stage of litigation in which it is challenged, which would be consistent with federal jurisprudence. See, e.g., *Bischoff v. Osceola County*, 222 F3d 874, 878 (11th Cir. 2000) ("[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (112 SCt 2130, 119 LE2d 351) (1992))). But we have not fully considered the issue in depth before and need not do so here. Where the plaintiffs have established standing in this case, there is record evidence supporting it. And where standing is lacking in this case, the plaintiffs have not even alleged the violation of a right that would confer standing, so the quantum of proof is irrelevant.

17

See *Sawnee Elec. Membership Corp. v. Ga. Dept. of Revenue*, 279 Ga. 22, 24 (3) (608 SE2d 611) (2005); see also *Assn. of American Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F4th 531, 547 (6th Cir. 2021) (unlike associational standing, third-party standing "does not relieve plaintiffs of the need to independently establish their *own* Article III standing" (emphasis in original)). In concluding that federal third-party standing doctrine was inconsistent with Georgia standing doctrine that allowed a plaintiff to vindicate only his own rights, rather than the rights of others, *Wasserman* noted that federal associational standing doctrine also seemed inconsistent with Georgia standing law. 320 Ga. at 649 (II) (B) (2) n.14 ("the same reasons that require us to excise federal third-party standing from Georgia law would seem to apply to federal associational standing"). But *Wasserman* left the question of the viability of federal associational standing unresolved because it was not at issue in that case. See id. It is squarely at issue here, and so, applying *Wasserman*, we conclude that the federal associational standing doctrine that we adopted in *Aldridge v. Ga.*

18

*Hospitality & Travel Assn.*, 251 Ga. 234 (304 SE2d 708) (1983), is not a correct statement of Georgia law.

As with other federal theories of standing, we uncritically adopted the federal associational standing theory in *Aldridge*. In that case, we adopted the federal three-part test for associational standing, allowing an association to have standing when

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Aldridge*, 251 Ga. at 236 (1) (punctuation omitted; quoting *Hunt v. Washington State Apple Advertising Comm.,* 432 U.S. 333, 343 (97 SCt 2434, 53 LE2d 383) (1977)).

We were wrong to adopt this theory into Georgia law. *Aldridge* involved a trade association attempting to protect the private rights of its business members by challenging a county's imposition of inspection fees against those businesses, and we concluded that the trade association had standing under the novel theory of associational standing. 251 Ga. at 235, 236 (1). *Aldridge* cited only

19

federal authority and law review articles and did no analysis whatsoever of whether the theory was consistent with the judicial power under the Georgia Constitution. See id. at 236 (1); see also *SCV*, 315 Ga. at 45 (2) (a) & n.4 (Georgia courts are permitted to consider federal standing precedent persuasive only when it was "guided by the same language, history, and context" as that of Judicial Power Paragraph (citation and punctuation omitted)). *Wasserman*'s reasoning that the federal doctrine of third-party standing has no place in Georgia law applies with equal force here, as federal associational standing is but a type of third-party standing. A historical review of our decisional law reflected "a consistent understanding that a plaintiff must assert her own legal rights to have a Georgia court resolve a dispute about the relative rights of the parties to an action" and that Georgia courts do not have the power to resolve the rights of parties not before the court. 320 Ga. at 644 (II) (A) (2). Having concluded that federal associational standing is incompatible with our Constitution, we

must decide whether to retain this theory as a matter of stare decisis.

> Under the doctrine of stare decisis,
>
> courts generally stand by their prior decisions, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. But stare decisis is not an inexorable command. To that end, we have developed a test that considers the age of precedent, the reliance interests at stake, the workability of the decision, and, most importantly, the soundness of its reasoning.

*State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) (citation and punctuation omitted). "These considerations," however, "are guideposts, not a mechanical formula or a multi-factor test." *Wasserman*, 320 Ga. at 647 (II) (B) (1). Therefore, the essential "question whether to overrule a precedent comes down to whether getting the law right is worth the cost to the rule of law of unsettling what had been settled." Id.

We previously have said that "stare decisis carries less weight when our prior precedent involved the interpretation of the

21

Constitution, which is more difficult than statutory interpretation for the legislative process to correct." *Olevik v. State*, 302 Ga. 228, 245 (2) (c) (iv) (806 SE2d 505) (2017) (citing *Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, Inc*., 294 Ga. 593, 601 (2) (755 SE2d 184) (2014)). "This doesn't mean that we disregard stare decisis altogether, though; what it actually means is that the first stare decisis factor (soundness of reasoning) becomes even more critical. The more wrong a prior precedent got the Constitution, the less room there is for the other factors to preserve it." *Olevik*, 302 Ga. at 245 (2) (c) (iv).

Because *Aldridge* "uncritically import[ed] into Georgia law holdings of federal courts about federal law," it "fall[s] into the category of unreasoned and arbitrary decisions that we have been more willing to reconsider." *Wasserman*, 320 Ga. at 647-648 (II) (B) (2). Like the theory of third-party standing rejected in *Wasserman*, federal associational standing is not only incompatible with our longstanding constitutional standing rule, but it also wrongly expanded the power of Georgia courts to resolve certain cases. See

id. at 648 (II) (B) (2). In other words, *Aldridge* is an aberration in our standing law, making a "poor fit" that ought to be discarded from "a system that is supposed to treat like cases alike." Id. Although federal associational standing is not "unworkable," its three-part test is less workable than "the clear and time-tested rule that a party must assert [his] own rights to maintain an action." Id.

None of the other considerations relevant to stare decisis counsel in favor of retaining associational standing under *Aldridge*. The age of the precedent does not itself lend much weight to retaining it, as we have overruled decisions that are just as old or older. See, e.g., *Frett v. State Farm Employee Workers' Comp.*, 309 Ga. 44, 62 (3) (c) (844 SE2d 749) (2020) (overruling 85-year-old precedent); *Southall v. State*, 300 Ga. 462, 468 (1) (796 SE2d 261) (2017) (overruling 45-year-old precedent); *Lane,* 308 Ga. at 17 (1) (overruling 40-year-old precedent). More important than mere age, although the doctrine of associational standing has been applied in a few reported decisions, there is no indication that it has become so "entrenched" in our jurisprudence, see *Williams v. Harvey*, 311 Ga.

23

439, 451 (1) (b) (858 SE2d 479) (2021), that discarding this doctrine would be "enormously disruptive" to the legal system. Compare *Cook v. State*, 313 Ga. 471, 512 (2) (a) (870 SE2d 758) (2022) (Peterson, J., dissenting). There are no reliance interests at stake, at least none identified by the parties. See *Savage v. State of Ga.*, 297 Ga. 627, 641 (5) (b) (774 SE2d 624) (2015) (substantial reliance interests are most common in contract and property cases where parties may have acted in conformance with existing legal rules in order to conduct transactions). Consequently, we overrule *Aldridge* and other cases to the extent they recognized federal associational standing doctrine as a viable theory of standing under the Georgia Constitution.[6]

---

[6] Because Plaintiff-Intervenors assert only associational standing under *Aldridge*, we need not and do not consider whether there might be some other form of standing compatible with the Georgia Constitution that associations may be able to assert. Those cases that recognized federal associational standing as a viable doctrine and that are hereby overruled to the extent they did include: *Ga. Assn. of Club Executives, Inc. v. State of Ga.*, 320 Ga. 381, 382 (1) n.1 (908 SE2d 551) (2024); *BVMF*, 313 Ga. at 387-390 (1) (b); *New Cingular Wireless PCS, LLC v. Dept. of Revenue*, 308 Ga. 729, 734 (843 SE2d 431) (2020); *Feminist Women's Health Ctr. v. Burgess*, 282 Ga. 433, 434 (1) (651 SE2d 36) (2007); *Atlanta Taxicab Co. Owners Assn. v. City of Atlanta*, 281 Ga. 342, 344 (2) (638 SE2d 307) (2006); *Sawnee Elec. Membership Corp.*, 279 Ga. at 24 (3);

(c) *The Plaintiffs have failed to show that community-stakeholder standing applies in this case.*

The Plaintiffs alternatively argue that they have standing to challenge all the rules because they are community stakeholders, but they have not established that this standing is available in the context of a suit against the State, as opposed to suits against local governments.

In *SCV*, we held that Georgia law has long provided that when a local government owes a legal duty to community stakeholders (i.e., citizens, voters, residents, or taxpayers), those stakeholders have a legal right for the local government to fulfill that duty. The violation of that legal right gives standing to a stakeholder, even if the stakeholder in the case neither faces nor has suffered any individualized injury distinct from that to the community at large. 315 Ga. at 53 (2) (b), 61 (2) (c) (iii). *SCV*'s holding was limited to suits against local governments, as the only issue before us in that case

---

*Newton County Home Builders Assn. v. Newton County*, 286 Ga. App. 89, 91 (648 SE2d 420) (2007); *Dept. of Revenue v. Sawnee Elec. Membership Corp.*, 265 Ga. App. 320, 321 (593 SE2d 756) (2004).

was whether the plaintiffs there had standing to sue their county board of commissioners. Id. at 61 (2) (c) (iii) n.19. We applied this principle again in *Cobb County v. Floam*, 319 Ga. 89 (901 SE2d 512) (2024), allowing several voters to challenge the constitutionality of a county board of commissioners' attempt to amend an act of the General Assembly. Id. at 92-95 (1). In making that determination, we rejected the county's argument that the plaintiffs' interest in having their government follow the law was insufficient and that the plaintiffs needed to show the violation of a private right, a requirement to raise a constitutional challenge to a state statute, which is based on the respect and deference we must afford to the General Assembly, as a co-equal branch of government. See id. at 92-93 (1). We concluded that this requirement did not apply to challenges to legislative action of a county commission, because the "county commission is not a part of State government, much less a branch co-equal with the State's judicial branch." Id.

Neither *SCV* nor *Floam* held that the community stakeholder theory of standing applied to suits against the State or its agencies.

26

The Plaintiffs argue that the reasoning underpinning both *SCV* and *Floam* support community-stakeholder standing here because they are seeking to "enforce a public duty" by ensuring that local election officials will "follow the law" as set forth in the Election Code. See *SCV*, 315 Ga. at 60-61 (2) (c) (iii). We disagree.

The Plaintiffs point to no authority other than *SCV* and *Floam* to support their argument, and neither case supports standing for claims against the State. See *SCV*, 315 Ga. at 61 (2) (c) (iii) n.19 ("Both our reasoning and our holding regarding [community-stakeholder] standing are limited to suits against local governments."); see also *Schoicket v. State*, 312 Ga. 825, 832 (1) (865 SE2d 170) (2021) ("[A] decision's holding is limited to the factual context of the case being decided and the issues that context necessarily raises." (citation and punctuation omitted)). And, as explained below, the rationale underlying community-stakeholder standing shows that it does not extend to claims against the State of the sort at issue here, at least as these plaintiffs have presented them.

The community-stakeholder standing rule traces its roots to taxpayer suits against municipal corporations (i.e., cities) based on the corporate form of the cities; this Court equated municipal taxpayers to private shareholders of private corporations and thus concluded that a taxpayer should have the same ability as private shareholders to sue the corporation to prevent illegal acts that would cause damage to the corporation in which the taxpayer was a stakeholder. See *SCV*, 315 Ga. at 55 (2) (c) (i). Specifically, in *Keen v. Mayor and Council of Waycross*, 101 Ga. 588 (29 SE 42) (1897), this Court reasoned that taxpayers of a municipality and private corporation shareholders were similarly situated and were similarly interested in preserving the corpus, such that taxpayers suing their city should have the same ability (standing) as private shareholders suing their company had to protect those interests and prevent any illegal acts that would otherwise cause loss and expense that taxpayers would ultimately bear. Id. at 593 (3); see also *Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 586 (1) (397

28

SE2d 699) (1990) (in a shareholder derivative suit, a shareholder brings a suit on behalf of the corporation for harm done to it).

This Court almost immediately extended this type of shareholder derivative suit against municipal corporations to suits against county governments. See, e.g., *Koger v. Hunter*, 102 Ga. 76, 79-80 (29 SE 141) (1897) (trial court erred in denying taxpayers' petition to enjoin county commissioners from allegedly misappropriating county funds). That extension, regularly applied, became part of a consistent and definitive understanding of Georgia's judicial power that was eventually incorporated into the 1983 Constitution's Judicial Power Paragraph. See *SCV*, 315 Ga. at 55-61 (2) (c). But this rationale has never been expressly extended to suits against the State such that it would have become baked into the Judicial Power Paragraph.

*SCV* noted that the principle that would become recognized as community-stakeholder standing appears to have been applied to suits against the State in two instances. See 315 Ga. at 58-59 (2) (c) (ii), 60 (2) (c) (iii) (citing *Arneson v. Bd. of Trustees of the Employees'*

29

*Retirement System of Ga.*, 257 Ga. 579, 579-580 (1)-(3) (361 SE2d 805) (1987), and *Head v. Browning*, 215 Ga. 263, 266-267 (2) (109 SE2d 798) (1959)).[7] But those cases applied a type of community-stakeholder standing without engaging in any reasoning. Importantly, neither *Arneson* nor *Head* considered precedent existing at the time (and that remains good law today) that "one cannot raise the question of constitutionality of a statute, or of the action of an administrative agency acting under statutory power, as violative of constitutional rights, unless the interest or rights of such complaining party are affected by the statute or the action of the agency." *West v. Housing Auth. of City of Atlanta*, 211 Ga. 133, 136 (1) (b) (84 SE2d 30) (1954); see also *Davis v. Jackson*, 239 Ga. 262, 264 (236 SE2d 613) (1977).

---

[7] These cases have also been abrogated on other grounds, but they are nevertheless correct to the extent they note the general principle that taxpayers have standing to seek enforcement of a public duty by way of some viable cause of action. See *SJN Properties, LLC v. Fulton County Bd. of Assessors*, 296 Ga. 793, 799 (2) (b) (ii) n.7 (770 SE2d 832) (2015) (after noting precedent abrogating the ability to prosecute injunction actions against state officials, stating that "to the extent these cases simply confirmed a taxpayer's standing to seek to enforce a public duty by way of some viable cause of action, they remain good law").

Because *Arneson* and *Head* are clear outliers in the context of challenges to State actions, they did not rebut the general requirement that a plaintiff must assert the violation of his own individual right, as opposed to a community-stakeholder right, to challenge actions by the State. The Plaintiffs have identified no case in which we even suggested, much less held, that the rationale underlying shareholder derivative suits — rooted in doctrine about private corporations — would apply to suits against the State. And because nothing else that was said in *SCV* or *Floam* would support extending community-stakeholder standing to the challenge here, the Plaintiffs failed to establish that those cases, by themselves, establish community-stakeholder standing.[8]

Having concluded that the plaintiff organizations do not have standing under theories of organizational or associational standing that they assert and that none of the plaintiffs have standing under

---

[8] Our rejection of the Plaintiffs' community-stakeholder standing is based purely on the arguments raised here and should not be read as foreclosing the possibility that community-stakeholder standing might apply to some challenges to certain state actions better suited to the rationale for such standing.

community-stakeholder status, we turn to evaluate whether any individual plaintiffs have standing to challenge any of the rules.

(d) *The individual plaintiffs have standing as voters to challenge five rules that threaten the right to vote.*

The trial court concluded that the individual plaintiffs, Turner and Hall, have standing as voters to challenge all seven rules. We conclude that, as voters, they have standing to challenge five of the seven rules — the Reasonable Inquiry Rule, the Examination Rule, the Hand Count Rule, the Drop Box ID Rule, and the Drop Box Surveillance Rule.

The right to vote is fundamental; it is necessary to preserve our republic and our liberty.[9] See *Favorito v. Handel*, 285 Ga. 795, 796 (1) (a) (684 SE2d 257) (2009) ("The right to vote is fundamental, forming the bedrock of our democracy." (citation and punctuation omitted)). As we observed many years ago, "[i]t can not be said that

---

[9] The right to vote is enshrined in the Georgia Constitution. See Ga. Const. of 1983, Art. II, Sec. I, Par. II. Accordingly, we need not consider federal authority in our analysis.

[the right of a citizen to vote] is not a personal right, the denial of which would be an injury as an infringement of that right." *Manning v. Upshaw*, 204 Ga. 324, 327 (2) (49 SE2d 874) (1948). An infringement of the right to vote occurs both when a voter is prevented from casting a ballot and when a properly cast vote is not counted. See *Thompson v. Willson*, 223 Ga. 370, 373 (2) (155 SE2d 401) (1967) ("A refusal to count his vote completely ignores it and is tantamount to a refusal to allow him to cast it.").

Because voting is a private right, a voter has standing to challenge a rule on the basis it violates his right to vote, which includes the right to have his vote counted. See *Wasserman*, 320 Ga. at 631-632 (II) (A) (1) (a) (i) (noting that it has been a "core function" of the courts to resolve disputes about private rights, including the infringement of voting rights); *SCV*, 315 Ga. at 52 (2) (b) (historically, the violation of a private right was sufficient to invoke the judicial power of state courts); *Barrow v. Raffensperger*, 308 Ga. 660, 667 (2) (b) (842 SE2d 884) (2020) (voter had standing to challenge the Secretary of State's decision to cancel an election);

33

*Manning*, 204 Ga. at 327 (2) (voter had standing to challenge the constitutionality of an act that allowed mayor and councilmembers to refuse to hold an election). Such standing is known as voter standing.

On the whole, five of the SEB rules at issue implicate an individual's right to vote or have his vote counted. There are two rules — the Drop Box ID Rule and the Drop Box Surveillance Rule — that govern the delivery of absentee ballots and limit the ability to deliver absentee ballots. The Drop Box ID Rule requires the presentation of photo identification for certain people who are hand-delivering the absentee ballot of another, where the corresponding statute does not require this and where identification would not be required for that person to mail the ballot of another. See Ga. Comp. R. & Regs., r. 183-1-14-.02 (18). And the Drop Box Surveillance Rule provides that absentee drop boxes that are not under constant video surveillance shall be removed and prohibited from use. See Ga. Comp. R. & Regs., r. 183-1-14-.02 (19). There is some risk that a voter who submitted an absentee ballot in violation of either rule,

34

either because the person delivering the ballot lacked a photo ID or because the drop box was not under video surveillance, would have his ballot rejected and, as a result, his right to vote would be denied.[10]

Three other rules — the Reasonable Inquiry Rule, the Examination Rule, and the Hand Count Rule — concern the tabulation and certification of election results. By their very nature, these rules implicate the proper counting of cast votes. For example, under the Hand Count Rule, election officials may take "corrective measures" if there is an inconsistency between the hand count ballot totals and the number generated from the tabulation tape from electronic scanners.[11] See Ga. Comp. R. & Regs., r. 183-1-12-.12 (a)

---

[10] In their declarations, Hall and Turner stated that they were uncertain as to the method they would vote in the future, leaving open the possibility that they would exercise their right to vote by absentee ballots. Thus, this is not a situation where a plaintiff was unable to show that the challenged State action was harmful to his individual rights. Compare *Perdue v. Lake*, 282 Ga. 348, 348-350 (2) (647 SE2d 6) (2007) (voter lacked standing to challenge a statute requiring a photo ID as an unconstitutional restriction on her right to vote because, at the time she filed her complaint, she could have voted in person without the need to show a photo ID and she had made no assertion that she lacked an acceptable form of a non-photo ID).

[11] Absentee ballots are also scanned. See OCGA § 21-2-386 (a) (2) (A) (detailing process for opening and scanning absentee ballots).

35

(5). And, before election officials certify an election, the Reasonable Inquiry Rule and the Examination Rule would allow local election officials to conduct a broad inquiry into election results, including by "examining all election related documentation," before certifying results, potentially permitting them to refuse to certify elections, even past statutory requirements, until the election official is satisfied that the results are "complete and accurate." See Ga. Comp. R. & Regs., rr. 183-1-12-.02 (1) (c.2), 183-1-12-.12 (a) (.1) (6). Although it is not certain that these rules would actually lead to the rejection of votes that have been cast, the threatened violation of a plaintiff's rights is sufficient to establish standing.

The State argues that the individual plaintiffs' claimed rights violations are merely speculative concerns or uncertainties premised entirely on hypotheticals, not on anything imminent or concrete. Given that, at the time the amended complaint was filed in this case, the SEB had already adopted the rules being challenged and those rules were to apply to the November 2024 election, the State does not explain why the threat to the rights asserted by the

36

Plaintiffs was not impending at the time the complaint was filed and continues to be so given upcoming elections.

The State also does not grapple with our long-standing precedent that an infringement on the private right to vote is an injury sufficient to establish standing for a voter to challenge the constitutionality of an act of the General Assembly. See *Manning*, 204 Ga. at 327 (2). And if the violation of a private right is sufficient to challenge the constitutionality of a statute, then it is certainly sufficient to challenge the constitutionality of an agency's action. Under this precedent, we can also easily reject the State's argument that the individual plaintiffs have not established an individualized injury and thus do not have standing because they failed to distinguish any harm that they might suffer beyond that which the voting public at large might suffer. See *Camp v. Williams*, 314 Ga. 699, 708 (879 SE2d 88) (2022) ("[W]e have held in other contexts that voting rights are individually cognizable for litigation purposes, *even if* they are shared among the general public." (citing *Manning*; emphasis in original)).

(e) *Voter standing has not been established to challenge the poll watcher and daily reporting rules since they do not touch on the right to cast votes or have them counted.*

There are two rules — the Poll Watcher Rule and the Daily Reporting Rule — that do not concern the casting or counting of votes, so the individual plaintiffs do not have voter standing to challenge these rules. A brief overview of these rules shows why.

For general elections and run-offs, OCGA § 21-2-408 (b) provides that poll watchers are selected by political parties, political bodies, independent candidates in partisan elections, and candidates in nonpartisan elections. See also OCGA § 21-2-408 (a) (in primary elections, parties select poll watchers from nominations submitted by candidates). For counties or municipalities using direct recording electronic voting systems or optical scanning systems, the Election Code provides that selected poll watchers are allowed to be in locations within the tabulation center that are

38

designated by the superintendent,[12] including "the check-in area, the computer room, the duplication area, and such other areas as the superintendent may deem necessary to the assurance of fair and honest procedures in the tabulating center." OCGA § 21-2-408 (c).[13] The Poll Watcher Rule gives additional guidance for locations using optical scanning equipment, stating that "designated places" include areas where the "tabulation processes are taking place including but

___

[12] A "superintendent" is defined as:
    (A) Either the county board of elections, the county board of elections and registration, the joint city-county board of elections, or the joint city-county board of elections and registration, if a county has such;
    (B) In the case of a municipal primary, the municipal executive committee of the political party holding the primary within a municipality or its agent or, if none, the county executive committee of the political party or its agent;
    (C) In the case of a nonpartisan municipal primary, the person appointed by the proper municipal executive committee;
    (D) In the case of a municipal election, the person appointed by the governing authority pursuant to the authority granted in Code Section 21-2-70; and
    (E) In the case of the State Election Board exercising its powers under subsection (f) of Code Section 21-2-33.1, the individual appointed by the State Election Board to exercise the power of election superintendent.
OCGA § 21-2-2 (35).
[13] Moreover, poll watchers are to be "granted access to polling places, advance voting locations, tabulation centers, and locations where absentee ballots are being verified, processed, adjudicated, and scanned and may be permitted behind the enclosed space for the purpose of observing the conduct of the election and the counting and recording of votes." OCGA § 21-2-408 (d).

not limited to provisional ballot adjudication of ballots, closing of advanced voting equipment, verification and processing of mail in ballots, memory card transferring, regional or satellite check in centers and any election reconciliation processes as the election superintendent may deem necessary[.]" See Ga. Comp. R. & Regs., r. 183-1-13-.05.

The Daily Reporting Rule is also based on a statutory provision, with OCGA § 21-2-385 (e) generally providing that each county board of registrars (or municipal absentee ballot clerk) shall make daily reports of the number of persons who have voted by absentee ballots or at an advance voting site. For purposes of our standing discussion here, the Daily Reporting Rule largely tracks the statute. See Ga. Comp. R. & Regs., r. 183-1-12-.21.

Unlike the voting-related rules discussed elsewhere in this opinion, neither the Poll Watcher Rule nor the Daily Reporting Rule impacts the manner in which a vote is cast or collected or affects the counting of votes. Poll watchers observe and are prohibited from interfering with election activities at the polls. See OCGA § 21-2-408

40

(d). Likewise, the Daily Reporting Rule merely requires a summary of the votes that have already been cast, but in no way affects the counting of those votes. Because the Plaintiffs cannot establish that these two rules would ever infringe on the right to vote, they cannot rely on voter standing to challenge these two rules. And the individual plaintiffs identify no other private right that those two rules violate.[14]

(f) *We vacate the trial court's order to the extent it found that Hall had standing as a member of the Chatham County Board of Elections.*

Hall also argues that he has standing based on interests of a nature that we have not previously addressed and were not considered according to the proper standard below. We therefore vacate and remand for the trial court to consider it in the first instance.

---

[14] The Plaintiffs seemed to concede as much at oral argument, relying more on a theory of community-stakeholder standing to challenge these two rules, and we have already rejected this theory above.

Hall argues that he has standing to challenge all the rules based on his official role as a member of the Chatham County Board of Elections. In support of his claim, Hall notes his concern that he might misinterpret or fail to follow his duties as an election official because he was unsure whether he should follow the Election Code or the SEB rules, and notes that he took an oath of office to uphold the law and that he would face legal consequences if he took the wrong action as an election official. In concluding that Hall had standing on this basis, the trial court found that "Hall, in his individual capacity, is concerned about his role as a member of the Chatham County Board of Elections regarding whether to follow the SEB's rules or the Election Code," and that absent clarification on this issue, Hall would expose himself to legal liabilities.

But, as we explain below, a need for certainty is a concept that pertains to a plaintiff's ability to pursue declaratory relief; that is not also a basis for constitutional standing. The trial court's focus on Hall's statutory standing regarding declaratory relief left unaddressed his claim of constitutional standing on the basis of his

role as a member of the Chatham County Board of Elections. See *SCV*, 315 Ga. at 64 (2) (d) (distinguishing statutory standing from constitutional standing). Although we might accept Hall's declaration that he faces some personal harm if he were to take the wrong action with respect to the challenged rules, our recent precedent reminds us that factual harm, by itself, generally is not sufficient under Georgia law to establish constitutional standing. Whether and to what extent Hall can establish constitutional standing in this individual capacity lawsuit based on his affiliation with the board is not an issue that was addressed below, so we vacate and remand on this issue for the trial court to conduct that analysis in the first instance.[15]

---

[15] In considering the extent to which Hall may have established standing based on his interests as a board member, some novel and difficult issues may require resolution. For example, can he litigate his interests as a board member in a lawsuit brought in his individual capacity? Would he have to identify a private right of his own at issue, or does his affiliation with the board — as a governmental entity — allow him to dispense with that requirement? We note these sorts of issues not to say they would definitely require resolution (much less to suggest what that resolution would be), but merely to illustrate the kind of things that may need to be considered as this is litigated below.

43

In sum, EVA and the Plaintiff-Intervenors do not have standing to challenge any of the rules because they have not established that any rule violates any of those organizations' private rights, and they cannot assert the rights of others under theories advanced here. The individual voters, Hall and Turner, have standing to challenge five rules based on their status as voters, but they do not have voter standing to challenge two other rules because there is no violation of that private right.

3. *Plaintiffs' challenges to the SEB rules are not too vague.*

The Defendant-Intervenors argue that the Plaintiffs' constitutional claims are too vague to be justiciable,[16] because they are unclear whether they seek a judgment declaring all or just some of the SEB's rulemaking powers unconstitutional. We disagree.

In support of their argument that the Plaintiffs' claims are too vague to be justiciable, the Defendant-Intervenors cite *Wallin v. State*, 248 Ga. 29 (279 SE2d 687) (1981), which stated:

---

[16] The Defendant-Intervenors took no position on the Plaintiffs' constitutional standing in their primary brief on appeal.

44

> In order to raise a question as to the constitutionality of a law, at least three things must always be shown: (1) The statute or the particular part or parts of the statute which the party would challenge must be stated or pointed out with fair precision; (2) the provision of the Constitution which it is claimed has been violated must be clearly designated; and (3) it must be shown wherein the statute, or some designated part of it, violates such constitutional provision.

Id. at 30 (1) (citation and punctuation omitted).

Even if that standard extends beyond challenges to statutes and applies also to challenges to agency actions (a question we need not and do not decide), that standard is satisfied here. Although the Plaintiffs alleged in their complaint that all the SEB's rules violated the nondelegation doctrine under the Georgia Constitution's Separation of Powers Provision, citing several cases construing that provision, their specific counts for relief focused mostly on seeking a declaration that the seven rules were unconstitutional under nondelegation principles and contrary to the Election Code.

To the extent the Plaintiffs requested that all of the SEB's other rules be declared unconstitutional or sought to enjoin all of the SEB's rules, this request did not render the entire complaint too

indefinite. The Plaintiffs' request may have been broad, but it was clear. Even if the broadness of their initial request made their claims too vague to be justiciable, subsequent actions clarified the Plaintiffs' challenge. In a pretrial order, all the parties agreed that the main issues to be tried were whether the seven rules on appeal were contrary to the Election Code or violated Georgia's nondelegation doctrine. The trial court was not confused about what the Plaintiffs were requesting. On the first page of its order, the trial court noted that the Plaintiffs were challenging the seven specific rules that were identified in the complaint, as amended. Thus, even if the Plaintiffs had requested overly broad relief initially, the trial court did not consider or grant such relief. As a whole, then, the Plaintiffs' complaint states what rules it challenges (at least as to the seven rules at issue on appeal), the provision of the Georgia Constitution that it claims was violated (the Separation of Powers Provision), and how the rules violated that provision or were otherwise unauthorized by law. Thus, contrary to the Defendant-

Intervenors' argument, the complaint was not too "vague" or "indefinite" to preclude consideration of the rules at issue on appeal.

2. *Availability of declaratory relief was proper.*

The State argues that the trial court should not have granted declaratory relief because the Plaintiffs presented nothing more than "uncertainty" and "concern" that the challenged rules *might* cause some future harm and because they failed to allege that they risked taking some undirected future action that would jeopardize their interests. We disagree.

> Under the Declaratory Judgment Act [(the "Act")], the courts of this State are authorized to declare rights and other legal relations of any interested party petitioning for such declaration in cases of actual controversy and in any civil case in which the ends of justice so require.

*Floam*, 319 Ga. at 96 (2) (cleaned up; quoting OCGA § 9-4-2 (a), (b)). The plain text of the Act provides that "its purpose 'is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" Id. (quoting OCGA § 9-4-1). The Act is not meant to enforce accrued rights, as the Act does not replace existing remedies. See *Cohen v. Reisman*, 203 Ga. 684, 684

47

(1) (48 SE2d 113) (1948). Nor is the Act designed to resolve mere disagreement about "the abstract meaning or validity" of a statute, rule, or ordinance. See *Leitch v. Fleming*, 291 Ga. 669, 670 (1) (732 SE2d 401) (2012). Instead, its purpose is to remove the cloud of uncertainty "with regard to the propriety of some future act or conduct, which is properly incident to his alleged rights and which if taken without direction might reasonably jeopardize his interest." *Baker v. City of Marietta*, 271 Ga. 210, 214 (1) (518 SE2d 879) (1999) (citation and punctuation omitted). When a declaration of rights would not direct the plaintiff's future conduct or would merely determine rights that had already accrued, relief under the Act is unavailable. See *Floam*, 319 Ga. at 97-99 (2) (collecting cases).

As discussed above, the five rules before us now concern how votes can be cast or delivered and how they are to be counted. In their sworn declarations, the individual plaintiffs stated that they are uncertain whether the new rules would lead to a rejection or non-certification of their votes. They also stated that they are uncertain how or whether to vote based on the challenged rules. This

type of uncertainty and the need for guidance is sufficient to state a claim for declaratory relief. As discussed above, there is a possibility that certain absentee ballots will not be delivered appropriately and so would be rejected, either because no identification is provided by the courier or because a ballot is placed into a drop box that was not under video surveillance. Thus, the voters have shown the need for a determination as to the legality of these rules, along with others affecting the counting of votes.

The State argues that declaratory relief was improper because the Plaintiffs "did not state that the rules actually did infringe upon their right to vote or have their votes counted." But "[a] request for declaratory relief is a request for prospective relief — relief from the threat of wrongful acts and injuries yet to come." *Floam*, 319 Ga. at 99 (2) (citing *Lathrop v. Deal,* 301 Ga. 408, 434 (801 SE2d 867) (2017); punctuation omitted). If a voter were required to prove with certainty that a particular rule infringed upon his right to vote, that would require an election to have actually occurred, which would also render declaratory relief unavailable, as that would involve a

determination of rights that had already accrued. See *Floam*, 319 Ga. at 97 (2). Such an outcome would make a voter's ability to seek declaratory relief under Paragraph V completely illusory.

The Plaintiffs' sworn statements are sufficient to assert a claim for declaratory relief because the voters faced a risk of taking future undirected action that would nullify their votes. See *SJN Properties, LLC v. Fulton County Bd. of Assessors*, 296 Ga. 793, 802 (2) (b) (iii) (770 SE2d 832) (2015) ("The proper scope of declaratory judgment is to adjudge those rights among parties upon which their future conduct depends." (citation omitted)).

5. *The trial court erred in determining that the SEB rules violated the Federal Elections Clause.*

The Defendant-Intervenors and the State (collectively, the "Appellants") argue that the trial court erred in concluding that the SEB rules violated the Federal Elections Clause of the United States Constitution, which provides that the "Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof[.]" U.S. Const.,

50

Art. I, § 4, cl. 1. We agree.

In the trial court, the Plaintiffs did not demand that the SEB rules be invalidated as violating the Federal Elections Clause and tellingly do not defend on appeal the trial court's sua sponte grant of relief on this ground. In granting relief on this basis, the trial court relied primarily on concurring and dissenting opinions in various United States Supreme Court decisions, but it failed to apply binding precedent from that Court itself, which squarely rejects the notion that a state legislature cannot ever delegate any election "time, place, manner" regulatory authority to another state body. See, e.g., *Moore v. Harper*, 600 U.S. 1, 25 (143 SCt 2065, 216 LE2d 729) (2023) ("[A]lthough the [federal] Elections Clause expressly refers to the 'Legislature,' it does not preclude a State from vesting congressional redistricting authority in a body other than the elected group of officials who ordinarily exercise lawmaking power."); see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm.*, 576 U.S. 787 (135 SCt 2652, 192 LE2d 704) (2015) (rejecting Federal Elections Clause challenge to a state voter initiative to

51

remove redistricting authority from the state legislature and vest that authority with an independent commission). Thus, the trial court erred in finding that the SEB rules violated the Federal Elections Clause.

6. *Four of the challenged rules do not survive a proper nondelegation analysis, but one does.*

The Appellants argue that the trial court erred in concluding that the challenged rules violate the nondelegation doctrine of the Georgia Constitution. They argue that under existing precedent, the General Assembly's delegation of legislative power is constitutionally tolerable so long as it comes with sufficient guidelines, and that the statutes authorizing the SEB to promulgate rules (OCGA § 21-2-31 (1), (2), and (7)) meet this requirement. The Appellants point to this Court's decision in *DOT* as an "example" of what constitutes "sufficient guidelines."[17] The Appellants are

_____

[17] The Appellants also argue that the trial court erred by not considering the "threshold issue" of whether the SEB's exercise of rulemaking authority under the Election Code was the exercise of "legislative power." Specifically, the Appellants, citing some federal caselaw, argue that because the SEB

52

correct. If *DOT* applies, they win, because the authorizing statutes are most naturally understood as conferring broad, unguided rulemaking authority similar to that approved by *DOT*. But, as laid out below, a proper understanding of the Georgia Constitution's

---

regulates the conduct of executive officials, rather than private citizens, the SEB is not wielding legislative power and "there is no delegation problem." But Appellants' distinction between laws that regulate private conduct and laws that regulate the conduct of executive officials finds no basis in our caselaw's historic understanding of the legislative power that the Georgia Constitution vests only in the General Assembly.

We have long held that when it comes to the power of the General Assembly, the "people have clothed the Legislature with all power, except where they have made limitations[.]" *Nicholas v. Hovenor*, 42 Ga. 514, 517 (1871); see also *Plumb v. Christie*, 103 Ga. 686, 693-694 (30 SE 759) (1898); *Sears v. State of Ga.*, 232 Ga. 547, 553 (3) (208 SE2d 93) (1974); *McInerney v. McInerney*, 313 Ga. 462, 467 (2) (b) (870 SE2d 721) (2022). "Unlike the United States Congress, which has only delegated powers[,]" *Sears*, 232 Ga. at 553 (3), the General Assembly "can do all things not prohibited by the constitution," *Plumb*, 103 Ga. at 694, which includes the power to pass laws regarding government officials. See *DeKalb County Sch. Dist. v. Ga. State Bd. of Ed.*, 294 Ga. 349, 354 (1) (a) (751 SE2d 827) (2013) ("[T]he notion that the power to provide for the removal of public officers — even constitutional officers — inheres in the legislative power finds support in our history and precedents.").

If we were to accept the Appellants' framing that the "legislative" power of the General Assembly is limited to regulating private conduct, entire volumes of Georgia's Code would be void, as the General Assembly would have exceeded its constitutional authority in those instances. See, e.g., OCGA §§ 45-1-1 to 45-25-7 ("Public Officers and Employees"). That construction is obviously untenable. See *Johnson v. State*, 169 Ga. 814, 821 (1) (152 SE 76) (1930) (noting that this Court "should hesitate long before holding unconstitutional the statutes" at issue because that "would strike down a large body" of the law); *Goldsmith v. Rome R. Co.*, 62 Ga. 473, 478 (1) (1879) (noting that this Court should be hesitant to interpret the constitution in a manner that "would, in effect, obliterate from the statute book many of our best and most wholesome laws").

nondelegation doctrine demonstrates that *DOT* was wrongly decided and must be overturned. Georgia's nondelegation doctrine properly understood counsels against reading the authorizing statutes as broadly as we would otherwise read them. And once we have read those statutes narrowly, they do not authorize four of the five rules that the individual plaintiffs have standing to challenge.

(a) *Our caselaw provides a three-step framework for analyzing nondelegation challenges.*

The nondelegation doctrine of the Georgia Constitution is rooted in the separation of powers. See Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.").[18] Indeed, "[t]o permit the

---

[18] See also Ga. Const. of 1983, Art. III, Sec. I, Par. I ("The legislative power of the state shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."); Ga. Const. of 1983, Art. V, Sec. II, Par. I ("The chief executive powers shall be vested in the Governor. The other executive officers shall have such powers as may be prescribed by this Constitution and by law."); Ga. Const. of 1983, Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in the following classes of courts . . . .").

General Assembly to abdicate and transfer to administrative agencies of government essential legislative functions, would strike down our constitutional system, and inaugurate the police state, condemned by every advocate of individual liberty and freedom." *Glustrom v. State*, 206 Ga. 734, 740 (58 SE2d 534) (1950). This principle is "essential to the very foundation of our system of government[.]" *McCutcheon v. Smith*, 199 Ga. 685, 690-691 (2) (35 SE2d 144) (1945). Because the nondelegation doctrine is of a constitutional dimension and because the constitutional provisions from which the doctrine is derived were materially identical through multiple previous constitutions, our historic caselaw is critically important to understanding the nondelegation doctrine's current scope. See *Atlantic Games, Inc. v. Ga. Lottery Corp.*, 321 Ga. 267, 274 (3) n.9 (912 SE2d 618) (2025) (Peterson, P. J., concurring in the denial of certiorari) (tracing the history of the Separation of Powers Provision and the judicial, legislative, and executive vesting clauses and noting no material change in those provisions as relevant to the nondelegation doctrine); see also *Elliott v. State*, 305 Ga. 179, 184

(II) (B) (824 SE2d 265) (2019); *SCV*, 315 Ga. at 62 (2) (c) (iii).

Several types of nondelegation challenges may arise, but this case involves the prototypical type: an alleged improper delegation of legislative authority to an executive agency.[19] A review of our caselaw distills Georgia's nondelegation doctrine into a three-step framework. See *Atlantic Games*, 321 Ga. at 269 (2) (Peterson, P. J., concurring in the denial of certiorari). First, we determine whether

---

[19] Nondelegation issues can arise in a variety of contexts, including when any one of the three branches of government attempts to confer its power on another branch of government, see, e.g., *Franklin Bridge Co. v. Wood*, 14 Ga. 80, 84 (5) (1853) (nondelegation challenge to statute allegedly delegating legislative authority to courts), *Campbell v. Farmer*, 223 Ga. 605, 607 (157 SE2d 276) (1967) (nondelegation challenge to statute allegedly delegating legislative power to tax to an executive branch agency), and *Ogletree v. Dozier*, 59 Ga. 800, 801-802 (1877) (nondelegation challenge to statute authorizing county commissioners to hire out prisoners allegedly in contravention of the court's authority to sentence convicted defendants and the Governor's power to commute penalties), and when a branch of government attempts to confer its power on an entity outside the government, see, e.g., *Rogers v. Med. Assn. of Ga.*, 244 Ga. 151, 153 (2) (259 SE2d 85) (1979) (nondelegation challenge to statute allegedly delegating to a private organization the power to appoint members to a state board).

The Appellants argue that the SEB's "unique structure" — i.e., that the majority of the SEB members are appointed by the legislature (see OCGA § 21-2-30 (a), (c)) — makes this case a poor vehicle for answering "the broader question of whether executive branch agencies can wield legislative power subject to legislative guidelines." But the Appellants do not explain how this "uniqueness" prevents us from considering the nondelegation issues presented in this case where the Appellants have conceded, and it is undisputed, that the SEB is an "executive branch agency."

the General Assembly actually delegated the authority at issue to the executive branch agency. See id. Second, we determine whether the General Assembly possessed the allegedly delegated power. See id. Third, we assess whether the delegation was permissible. See id.[20]

Beginning with the first step, we ask whether the General Assembly, either expressly or by necessary implication, actually

---

[20] Although we characterize steps one and two as part of the nondelegation analysis, they are not nondelegation issues in the traditional sense. A determination that the legislature did not in fact delegate the authority in question is not a determination that a regulation violates the nondelegation doctrine so much as a conclusion that the regulation is invalid because it exceeds the agency's authority. Similarly, a determination that the legislature lacked the constitutional authority to do that which was delegated is not itself a delegation issue but rather a legislative act in excess of constitutional authority. Nevertheless, our caselaw consistently addresses these two steps to avoid answering the often more difficult question of whether the alleged delegation was permissible. See, e.g., *Premier Health Care Invs., LLC v. UHS of Anchor, LP*, 310 Ga. 32, 49-54 (3) (f) (849 SE2d 441) (2020); *HCA Health Servs. of Ga., Inc. v. Roach*, 265 Ga. 501, 502-503 (2) (458 SE2d 118) (1995); *City Council of Augusta v. Mangelly*, 243 Ga. 358, 361-362 (1) (254 SE2d 315) (1979). That is not to say that step two must always come before step three. While step one is a natural precursor to steps two and three (because, as explained more fully below, step one is purely a question of statutory construction and steps two and three may involve difficult constitutional questions), we can imagine a case where determining whether the legislature had the power to act is more difficult than determining whether the guidelines provided with the delegation are sufficient, such that we would decide step three without first deciding step two.

57

purported to delegate the powers exercised by the executive branch agency. See, e.g., *Bentley v. State Bd. of Med. Exam'rs*, 152 Ga. 836, 838 (111 SE 379) (1922); *R.R. Comm. of Ga. v. Macon Ry. & Light Co.*, 151 Ga. 256, 258 (106 SE 282) (1921); see also *Atlantic Games*, 321 Ga. at 269 (Peterson, P. J., concurring). Because an agency is "a mere creature of . . . statute, brought into being by the legislature[,]" it has "no inherent powers" and "no lawful right to act except as directed by law." *New Amsterdam Cas. Co. v. McFarley*, 191 Ga. 334, 335-336 (12 SE2d 355) (1940); see also *Camp*, 314 Ga. at 709 (Bethel, J., concurring) ("[F]or a government entity whose authority on the relevant point is purely a creature of statute, the absence of statutory authority is the absence of legal authority to act."). As a result, if a statute does not "expressly, or by necessary implication," grant the powers allegedly exercised, any purported delegation has not actually occurred. *Bentley*, 152 Ga. at 838; see also *North Fulton Med. Ctr. v. Stephenson*, 269 Ga. 540, 542-544 (501 SE2d 798) (1998) (invalidating regulation because it conflicted with statute and agencies cannot "enlarge the scope of, or supply omissions in, a

58

properly enacted statute[,]" "change a statute by interpretation," or "establish different standards within a statute that are not established by a legislative body"); *HCA Health Servs. of Ga., Inc. v. Roach*, 265 Ga. 501, 502-503 (2) (458 SE2d 118) (1995) (invalidating agency's regulation in excess of authority because agency had "no constitutional authority to legislate"; its power was limited to the performance of an administrative function: "to promulgate rules for the enforcement of the General Assembly's enactments"); *Hunt v. Glenn*, 206 Ga. 664, 667 (58 SE2d 137) (1950) (The State Board of Education, "as an administrative agency of the State . . . may make rules and regulations which are in harmony with the purposes of the law, but it is without authority to make any rule or regulation which alters or limits the statute being administered.").

Because step one is purely a question of statutory construction and because steps two and three may require answering thorny constitutional questions, constitutional avoidance often counsels in favor of construing the statute narrowly at this step (if the statutory text permits). See, e.g., *Premier Health Care Invs., LLC v. UHS of*

*Anchor, LP*, 310 Ga. 32, 49-54 (3) (f) (849 SE2d 441) (2020) (construing statute narrowly to avoid interpreting statute as delegating impermissible authority to the Department of Community Health); *Glustrom*, 206 Ga. at 739-740 (resolving nondelegation challenge by interpreting statute as not delegating impermissible authority to the State Revenue Commissioner); *R.R. Comm.*, 151 Ga. at 258-259 (2) (concluding that in the absence of express authority to discontinue or abandon service of a particular railroad line, the Railroad Commission did not possess such implied powers).

At step two, we consider whether the General Assembly was vested with the power it allegedly delegated. "[I]t is elementary that the General Assembly is without constitutional authority to create an instrumentality of the State and clothe it with power . . . it does not itself possess." *Agricultural Commodities Auth. v. Balkcom*, 215 Ga. 107, 109 (1) (109 SE2d 276) (1959). In other words, if the Constitution does not permit the General Assembly to exercise a particular power, the General Assembly cannot confer that power on

an executive branch agency. See *State Ports Auth. v. Arnall*, 201 Ga. 713, 721 (1) (41 SE2d 246) (1947) ("[T]he State can not do indirectly that which it can not lawfully do directly. If the State may not lawfully do the things it is authorized to do under the act, then, of course, it may not lawfully do them through a corporation which is an instrumentality of the State exercising governmental functions."); *City Council of Augusta v. Mangelly*, 243 Ga. 358, 361-362 (1) (254 SE2d 315) (1979) (same).

Finally, at step three, if a statute actually delegates authority to an executive branch agency and the General Assembly possesses the authority to legislate on the issue, we evaluate whether the delegation was permissible. But characterizing this step as a "delegation" issue is a bit misleading. The Constitution vests all legislative power in the General Assembly, see Ga. Const. of 1983, Art. III, Sec. I, Par. I, and the nondelegation doctrine requires all powers vested in a branch of government to be exercised by that branch, see *Glustrom*, 206 Ga. at 740. Thus, we repeatedly have held that the General Assembly cannot actually "delegate" its vested

61

power to legislate to an executive branch agency. See *Phillips v. City of Atlanta*, 210 Ga. 72, 74 (77 SE2d 723) (1953) ("[T]he Constitution renders void any attempt to delegate legislative powers."); *Bohannon v. Duncan*, 185 Ga. 840, 842-843 (3) (196 SE 897) (1938) ("The legislative department of the State, wherein the [C]onstitution has lodged all legislative authority, will not be permitted to relieve itself by the delegation thereof."); *Southern Ry. Co. v. Melton*, 133 Ga. 277, 281 (65 SE 665) (1909) ("[W]hat is strictly and essentially a legislative duty must be performed by the legislature."); *Phinizy v. Eve*, 108 Ga. 360, 361 (1) (33 SE 1007) (1899) (noting that any attempt to confer legislative power on an entity outside the legislature would violate the constitution); *City of Savannah v. Hussey*, 21 Ga. 80, 89-90 (1857) (McDonald, J., concurring) ("The Legislature can not delegate its power. The people in their Constitution have declared where it shall exist, and by whom it shall be exercised.").

Although an executive branch agency cannot "legislate," "it is the function of the executive to implement specific legislation

enacted." *Greer v. State of Ga.*, 233 Ga. 667, 669 (1) (212 SE2d 836) (1975); see also Ga. Const. of 1983, Art. V, Sec. II, Par. II ("The Governor shall take care that the laws are faithfully executed . . . ."). Thus, the inquiry at this third step is more appropriately framed as whether "a statute delegates legislative authority (and thus is impermissible) or merely legislates in a way that confers responsibility on a particular executive branch agency to execute that particular statute." *Atlantic Games*, 321 Ga. at 272 (2) (C) (Peterson, P. J., concurring); see also *Franklin Bridge Co. v. Wood*, 14 Ga. 80, 84 (5) (1853) (upholding statute challenged on nondelegation grounds because "no Legislative power is delegated to the Courts by the acts under consideration[,]" rather "[t]here is simply a ministerial act to be performed — no discretion is given to the Courts").

For example, statutes comply with the nondelegation doctrine when they are "complete" when they leave the hands of the legislature, see *Holcombe v. Ga. Milk Producers Confederation*, 188 Ga. 358, 360, 365 (4) (3 SE2d 705) (1939), and merely delegate

responsibility to a particular administrative agency to implement and enforce the statute within prescribed and judicially enforceable limits. See, e.g., *Bohannon*, 185 Ga. at 842-843 (3) (the Milk-Control Act did not unlawfully delegate legislative authority because it "sufficiently fix[ed] the policy, general rules, and methods by which the milk control board should exercise its functions"); see also *Holcombe*, 188 Ga. at 360, 365-366 (4) (discussing the Milk-Control Act referenced in *Bohannon* and noting that the statute was "complete in its terms as to what the provisions of the law shall be" and required that the board take into consideration specific guidelines before acting); cf. *Phinizy*, 108 Ga. at 361-363 (1) (upholding statute even though it gave the delegatee "broad discretion" because that discretion was appropriately circumscribed by specific statutory guidelines).

By contrast, statutes that fail to provide objective, judicially enforceable guidelines that cabin the exercise of agency discretion essentially give to the executive the core legislative power to say what the law shall be and thus violate the nondelegation doctrine.

64

See, e.g., *Sundberg v. State*, 234 Ga. 482, 484 (216 SE2d 332) (1975) (striking down statute that left "the authority to a ministerial officer to define the thing to which the statute is to be applied" (citation and punctuation omitted)); *Howell v. State*, 238 Ga. 95, 95-96 (230 SE2d 853) (1976) (striking down criminal statute directing that "[a]ny person . . . who shall violate any of the rules or regulations promulgated by the commission shall be guilty of a misdemeanor" because it did not provide guidelines to limit the commission's discretion when passing such rules and regulations); *Bibb County v. Garrett*, 204 Ga. 817, 826 (51 SE2d 658) (1949) (striking down statute that "by its own terms undertook to vest in the board 'full power and authority, *in its discretion*, to *inaugurate, constitute*, and administer . . . pension and/or insurance provisions and benefits'" (punctuation omitted; emphasis in original)). Cf. *Mitchell v. Wilkerson*, 258 Ga. 608, 608-609 (372 SE2d 432) (1988) (striking down statute allowing any petitioner to specify grounds for recall election as "impermissible delegation of legislative authority" because the Constitution required the General Assembly to specify

65

such grounds and "this [was] a mandate which the General Assembly [could] not escape").

Thus, at the third step, the critical question is not whether a statute gives an administrative agency discretion, but whether the statute provides sufficiently objective, judicially enforceable guidelines to direct and cabin the agency's exercise of that discretion. Compare *Phinizy*, 108 Ga. at 361-363 (1) (upholding statute that gave judges the discretion to determine the method for calculating the applicable tax because it provided judges with specific guidelines, including "the subjects of taxation; when, how, and by whom, and to whom, returns [we]re to be made; when and by whom the rate must be calculated; and when and by whom and to whom the money must be paid") and *Bohannon*, 185 Ga. at 842-843 (3) (upholding statute that vested board with power to "fix maximum and minimum prices" of milk because the statute fixed "the policy, general rules, and methods" to be used by the board when making this determination), with *Moseley v. Garrett*, 182 Ga. 810, 816 (187 SE 20) (1936) (striking down statute that failed to provide grand

66

jury with any guidelines to consider when determining the compensation of a state officer) and *Richter v. Chatham County*, 146 Ga. 218, 220 (2) (91 SE 35) (1916) (striking down statute that "simply authorized the county officers to establish a system of registration" and did not provide any guidelines for the establishment of that system).

(b) *We overrule* DOT.

The Appellants argue that the SEB's rules do not violate the nondelegation doctrine because the General Assembly expressly conferred rulemaking powers on the SEB. Specifically, the Appellants point to the SEB's enabling legislation, which provides statutory authorization to promulgate rules "so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections[,]" OCGA § 21-2-31 (1), "consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections[,]" OCGA § 21-2-31 (2), and "to define uniform and nondiscriminatory standards

67

concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state[,]" OCGA § 21-2-31 (7).

The Appellants argue that this statutory grant of authority authorized the SEB's exercise of rulemaking power under the reasoning of *DOT*. In *DOT*, this Court upheld a statute delegating to a state commission the power to approve the exercise of eminent domain — long understood as part of the legislative power — if the commission found such a taking was "reasonable, necessary, and in the public interest." 260 Ga. at 700-702. This Court held that the "reasonable, necessary, and in the public interest" language was a sufficient guideline to overcome a nondelegation challenge. Id. at 703-704 (1). The Appellants argue that, if the statutory requirement that takings be "reasonable, necessary, and in the public interest" is sufficient, the SEB's statutory authority to promulgate rules to promote "uniform[ ]," "legal," "pur[e]," "fair," and "orderly" elections is also sufficient. See id.; OCGA § 21-2-31 (1), (2), (7). The Appellants are correct that under *DOT*, they would prevail. But *DOT* was

wrongly decided, and stare decisis does not preserve it.

*DOT* held that the statutory requirement that a taking be "reasonable, necessary, and in the public interest" was a sufficient guideline because we previously had held "that delegations of the power of eminent domain such as that here contain[ed] sufficient guidelines." 260 Ga. at 703-704 (1) (citing *State v. Moore*, 259 Ga. 139 (376 SE2d 877) (1989); *Eaves v. Harris*, 258 Ga. 1 (364 SE2d 854) (1988); *Williamson v. Housing Auth. of Augusta*, 186 Ga. 673 (199 SE 43) (1938)). But none of these cases actually support the proposition for which they were cited.

First, *Moore* and *Eaves* were decided after the adoption of the 1983 Constitution and do not substantively discuss our pre-1983 caselaw. See *Moore*, 259 Ga. at 142 (8), 142-143 (9); *Eaves*, 258 Ga. at 5 (3). Therefore, *Moore* and *Eaves* do not control our understanding of the original public meaning of the 1983 Constitution. See *Floam*, 319 Ga. at 94 (1) (noting that "cases post-dating the 1983 Constitution" could not "change the meaning of the Judicial Power Paragraph[,]" which had a "fixed meaning based on

69

consistent and definitive precedent"); see also *Olevik*, 302 Ga. at 235 (2) (c) (i) ("[T]here are few principles of Georgia law more venerable than the fundamental principle that a constitutional provision means today what it meant at the time that it was enacted."). In any event, *Moore* and *Eaves* are consistent with the historical requirement for express limitations on the exercise of discretion, so those cases cannot sanction the purported delegation at issue in *DOT*. See *Moore*, 259 Ga. at 142 (8), 142-143 (9) (statute provided a set of mandatory guidelines to consider before exercising discretion to designate roads for oversized vehicles); *Eaves*, 258 Ga. at 2, 5 (3) (statute permitted the Governor to suspend public official indicted for felony "[i]f, and only if," an appointed commission recommended suspension after the official's indictment for a felony). Second, *Williamson*, the only pre-1983 case cited by *DOT* on this point, did not discuss guidelines at all; thus, it cannot stand for the proposition that "reasonable, necessary, and in the public interest" is a sufficient guideline to cabin an agency's power. 186 Ga. at 680-681 (4). In sum, *DOT* was unsupported by any case it cited.

Even more fatal to *DOT* is that it was a clear deviation from our historic precedent. *DOT*'s "guidelines" were amorphous and not judicially enforceable. The statute at issue there allowed the agency to take all actions that were "reasonable, necessary, and in the public interest," but these are not objective standards. As outlined above, this Court has consistently struck down statutes that fail to provide clear, objective guidelines that cabin an executive branch agency's exercise of discretion. See, e.g., *Howell*, 238 Ga. at 95-96; *Garrett*, 204 Ga. at 826. Thus, *DOT* is irreconcilable with our historic precedent. The dissent in *DOT* recognized as much. See 260 Ga. at 706 (Smith, P. J., dissenting) ("The purpose of the legislation, the condemnation of public property, has not been expressly set out, the limits of the commission are not marked, administrative officers have not been designated, and the officers designated have not had their power limited to the promulgation of rules within the scope of the legislation designed to only administer and give effect to the law. The act is legislative in character and fact, and it is an unconstitutional delegation of authority under Art. III, Sec. I, Par. I

71

of the 1983 Constitution of the State of Georgia."). In short, *DOT* was wrongly decided.[21]

Before we overrule *DOT*, however, we must consider whether stare decisis counsels us not to. As we have stated, "[w]hen we consider whether to follow past decisions, stare decisis is the strong default rule." *Johnson v. State*, 315 Ga. 876, 887 (3) (885 SE2d 725) (2023). "In rare cases, however, following a past decision would do more harm to the rule of law than overruling it would." *Wasserman*, 320 Ga. at 645 (II) (B) (1) (quoting *Johnson*, 315 Ga. at 887 (3); punctuation omitted). In identifying those rare cases, we often consider "the age of precedent, the reliance interests at stake, the workability of the decision, and, most importantly, the soundness of its reasoning." *Lane*, 308 Ga. at 17 (1) (citation and punctuation omitted). But the ultimate question is "whether getting the law right

---

[21] We have previously questioned the soundness of *DOT*'s nondelegation holding. See, e.g, *Premier Health Care Invs., LLC*, 310 Ga. at 49 (3) (f) n.18 (noting that "[s]ome of us have doubts about whether [*DOT*] was rightly decided," but applying constitutional avoidance to construe statute to not present nondelegation problem).

is worth the cost to the rule of law of unsettling what had been settled." *Wasserman*, 320 Ga. at 647 (II) (B) (1).

We have already established that the reasoning in *DOT* was unsound and a departure from prior precedent, counseling strongly in favor of overruling it. See *Olevik*, 302 Ga. at 245 (2) (c) (iv) (holding that "unsound" reasoning cuts "heavily in favor of overruling" prior precedent); *Wasserman*, 320 Ga. at 646 (II) (B) (1) (noting that "we have been less inclined to preserve holdings that . . . are a departure from, dissonant with, inconsistent with, contrary to, or an aberration in [ ] precedent in the same area, because keeping such decisions can undermine rather than promote a system of equal treatment under the law" (citations and punctuation omitted)). As we have stated, we are more likely to reconsider obviously wrong constitutional precedents because they are harder for the People to abrogate and that means they are more likely to be left in place with an attendant corrosive effect on the rule of law. See, e.g., *Olevik*, 302 Ga. at 245 (2) (c) (iv) ("stare decisis carries less weight when our prior precedent involved the interpretation of the

73

Constitution, which is more difficult than statutory interpretation for the legislative process to correct"); *Wasserman*, 320 Ga. at 647 (II) (B) (1) (same); *Gilliam v. State*, 312 Ga. 60, 62 (860 SE2d 543) (2021) (same); see also *Frett*, 309 Ga. at 63 (Peterson, J., dissenting) ("stare decisis applies with little force to constitutional precedents because it is very difficult for the People and their elected representatives to overrule those precedents, if they think them incorrect" (citation and punctuation omitted)).

None of the considerations relevant to stare decisis that we typically consider suggest retaining *DOT*. *DOT* is not even 35 years old, and we have overruled decisions older than that. See, e.g., *Frett*, 309 Ga. at 62 (3) (c) (overruling 85-year-old precedent); *Southall*, 300 Ga. at 468 (1) (overruling 45-year-old precedent); *Lane*, 308 Ga. at 17 (1) (overruling 40-year-old precedent); *State v. Hudson*, 293 Ga. 656, 661-662 (748 SE2d 910) (2013) (overruling 38-year-old precedent). More importantly, *DOT* has not become "entrenched" in our jurisprudence, see *Williams*, 311 Ga. at 451 (1) (b), such that "jettisoning [this] precedent" would be "enormously disruptive" to

the legal system, compare *Cook*, 313 Ga. at 512 (2) (a) (Peterson, J., dissenting).[22] The parties have not shown that *DOT* affects substantial reliance interests, such as property or contract rights, or established a substantive right. See *Cook*, 313 Ga. at 489 (3) (c) ("[R]eliance interests are at their apex when they involve these types of interests."); *Savage*, 297 Ga. at 641 (5) (b) (substantial reliance interests are most common in contract and property cases where parties may have acted in conformance with existing legal rules in order to conduct transactions).[23] "Finally, to the extent that our existing rule is easier to apply, that is insufficient reason to retain

---

[22] Notably, we have cited *DOT* in only a handful of cases discussing whether a delegation was permissible. See *Tibbles v. Teachers Retirement System of Ga.*, 297 Ga. 557, 559 (1) (775 SE2d 527) (2015); *Pitts v. State*, 293 Ga. 511, 517 (3) (748 SE2d 426) (2013); *Harbuck v. State,* 280 Ga. 775, 778 (3) (631 SE2d 351) (2006).

[23] To be fair, the State may have relied on *DOT* in some exercises of its eminent domain power. But nothing about today's decision should be understood to unsettle any past exercises of eminent domain. Nor do we invalidate the statute at issue in *DOT*; that question is not before us. Moreover, the General Assembly annually adopts resolutions necessary for the management and disposition of State property, see, e.g., 2025 H.R. 97 (providing for disposition of state property) and H.R. 98 (providing for easements on state property). To the extent it becomes necessary, adding another such annual resolution to exercise eminent domain would of course be possible.

it." *Lane*, 308 Ga. at 17 (1).

Accordingly, we overrule *DOT* and other cases relying on it to the extent that they held that a statute delegating unbridled discretion to an executive branch agency comports with the constitutional contours of the nondelegation doctrine. We must next consider whether the rules challenged by the Plaintiffs comport with the nondelegation doctrine as we have now explained it.

(c) *The Drop Box Surveillance Rule survives a nondelegation analysis, but the remaining rules do not.*

Applying the nondelegation framework outlined above, we conclude that the Drop Box Surveillance Rule survives each of the three steps. The Reasonable Inquiry Rule, the Examination Rule, the Hand Count Rule, and the Drop Box ID Rule, however, fail at step one.[24]

Again, at step one of the nondelegation analysis, we ask whether the statute at issue delegates, either expressly or by

---

[24] All parties agree that the Georgia Constitution vests the General Assembly with the power to enact rules and procedures that govern elections. Thus, step two in the nondelegation framework is not in dispute.

76

necessary implication, the powers exercised by the executive branch agency. See, e.g., *Bentley*, 152 Ga. at 838. The Appellants point to OCGA § 21-2-31 (1), (2), (7), which provides the SEB with general rulemaking authority, as evidence that the specific rules at issue here were authorized by the Election Code. On its face, this statutory text would seem to support the Appellants' argument. OCGA § 21-2-31 (1), for example, allows the SEB to promulgate rules "so as to obtain uniformity" in the practices of local election officials. Thus, the Appellants argue that the Examination Rule, which allows board members to review all election related documentation prior to the certification of election results, is authorized by the Election Code because it promotes "uniformity" in election procedure by empowering all individuals involved in fulfilling the role of superintendent to inspect election materials. But if all local election officials are generally bound to follow SEB rules, then the SEB could be thought to have the power to adopt *any* rule merely because it would have uniform application. This is the type of unfettered discretion that we have now reiterated is

77

constitutionally intolerable. Thus, in the light of the Georgia Constitution's mandate that a statute must provide meaningful, objective guidelines to cabin an agency's exercise of discretion, we have serious concerns that these authorizing statutes — if interpreted as broadly as their text most reasonably suggests — lack "sufficient guidelines" that circumscribe the SEB's rulemaking power. See, e.g., *Garrett*, 204 Ga. at 826; *Bohannon*, 185 Ga. at 842-843 (3); *Moseley*, 182 Ga. at 816; *Richter*, 146 Ga. at 220 (2); *Phinizy*, 108 Ga. at 361-363 (1).

Because the Appellants' proposed construction would potentially render the relevant statutes and thus all of the SEB's rules, or at least a significant portion of them, unconstitutional, the canon of constitutional avoidance counsels against such a construction, if a reasonable alternative is possible. See *Glustrom*, 206 Ga. at 739 ("This court will never presume that the General Assembly intended to enact an unconstitutional law. Where the language of an act is susceptible of a construction that is constitutional, and another that would be unconstitutional, that

meaning or construction will be applied which will sustain the act.");

see also *Crowder v. State of Ga.*, 309 Ga. 66, 73 (2) (d) n.8 (844 SE2d

806) (2020) ("[T]he canon of constitutional avoidance allows courts

to choose between competing plausible interpretations of a statutory

text, resting on the reasonable presumption that the legislature did

not intend the alternative which raises serious constitutional

doubts." (citation and punctuation omitted)).

A reasonable limiting construction does exist. In several places

under OCGA § 21-2-31, which outlines the general duties of the SEB

in addition to providing for its rulemaking authority, the legislature

provided that the SEB is to act or promulgate rules "consistent with

law." See OCGA § 21-2-31 (2), (10). This statutory text permits a

narrowing construction of the SEB's rulemaking power to include

only the authority to pass rules consistent with the existing

statutory structure; in other words, the SEB can pass rules to

implement and enforce the Election Code, but it cannot go beyond,

change, or contradict the statutory scheme. See *Scoggins v.*

*Whitfield Finance Co.*, 242 Ga. 416, 417 (1) (249 SE2d 222) (1978)

(upholding statute delegating rulemaking authority to State Loan Commissioner, noting that the Commissioner "is not granted unlimited authority to promulgate rules" and the "rules must be necessary and appropriate, and *not inconsistent with the terms of the chapter* or any other applicable statutes" (emphasis added)); *Glustrom*, 206 Ga. at 739 ("The declaration, that a violation of 'rules and regulations *in accord with this Act*' shall be a misdemeanor, limited the power to promulgate rules, the violation of which would be a misdemeanor, to those in harmony with what the Assembly had already declared to be a crime." (emphasis added)).

This limiting construction of the SEB's rulemaking authority at step one likely avoids problems at step three (whether the statute supplies sufficient guidelines). As we have said, to ensure an executive branch administrative agency is merely executing the law rather than legislating, the statute must contain objective, judicially enforceable guidelines. See, e.g., *Garrett*, 204 Ga. at 826; *Bohannon*, 185 Ga. at 842-843 (3); *Moseley*, 182 Ga. at 816; *Richter*, 146 Ga. at 220 (2); *Phinizy*, 108 Ga. at 361-363 (1). The General Assembly's

mandate that the SEB's actions and regulations be "consistent with law" requires us to look at the specific substantive statutory provision at issue in the Election Code. These provisions, which cover a broad array of election procedures and protocols, provide in painstaking detail how elections are to be administered in Georgia. See OCGA §§ 21-2-1 to 21-2-604. Thus, when a rule is consistent with the specific statutory provisions it allegedly implements, it is also likely that the statute pursuant to which the rule was adopted supplies the objective, judicially enforceable guidelines needed to comply with the nondelegation doctrine. With these principles in mind, we turn to the five rules the Plaintiffs have standing to challenge.

(i) *The Examination Rule (Rule 183-1-12-.12 (a) (.1) (6)).*

Under OCGA § 21-2-493 (b), if "the total vote returned for any candidate or candidates for the same office or nomination or on any question exceeds the number of electors in such precinct or exceeds the total number of persons who voted in such precinct or the total number of ballots cast therein," the excess votes "shall be

81

investigated by the superintendent[.]" As part of this investigation, the superintendent shall "examine all the registration and primary or election documents whatever relating to such precinct[.]" OCGA § 21-2-493 (b). The statute, thus, limits the superintendent's document review to only those occasions on which the total votes exceed the total number of electors, voters, or ballots and also limits that review to only those documents "relating to" the precinct. See id. The Examination Rule, by contrast, permits election board members, who are included in the definition of superintendent,[25] to review "all election related documentation" — not specifically limited to a precinct that has excess votes — at any time "prior to the certification of results." Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (.1) (6) ("Board members shall be permitted to examine all election related documentation created during the conduct of elections prior to certification of results."). And that rule does not clearly constrain its application to the statutory limit of only those occasions on which the total votes exceed the total number of electors, voters, or ballots.

---

[25] See footnote 12 above.

The Appellants argue that the Examination Rule simply ensures that "all board members can examine election-related documents." Thus, they argue that the Examination Rule is essentially identical to OCGA § 21-2-493 (b). But the rule sweeps more broadly than the statute in at least three meaningful ways. First, OCGA § 21-2-493 (b) limits a local election official's review to certain documents "relating to such precinct," while the rule contains no geographical limitation whatsoever. More importantly, the statute permits local officials to review "election documents," but the rule allows review more broadly of election-*related* documents. One can envision many documents that are not "election documents" but may be related to an election. Finally, the rule permits document review in all cases so long as certification has not yet occurred, while the statute permits document review only when there is a discrepancy between the total votes and the number of electors, voters, or ballots.

The rule's sweep of what can be reviewed and when it can be reviewed is much broader than is permitted by statute. Accordingly,

the Examination Rule is inconsistent with — and thus not authorized by — the statute and is invalid at step one.

(ii) *The Hand Count Rule (Rule 183-1-12-.12 (a) (5)).*

The Election Code outlines the specific steps poll officers must take after the polls close. See OCGA §§ 21-2-436, 21-2-454, 21-2-485.[26] If ballot tabulating occurs at a central count location, "[a]s soon as the polls are closed and the last elector has voted[,]" poll officers are required to "[s]eal the ballot box and deliver the ballot box to the tabulating center[.]" OCGA § 21-2-485 (1) (A). "At the tabulating center, . . . [t]he ballots and other contents of the container shall . . . be removed, and the ballots shall be prepared for processing by the tabulating machines." OCGA § 21-2-483 (c). If ballot tabulation occurs at the precinct, "[a]s soon as the polls are closed and the last elector has voted[,]" poll officers are required to

_____

[26] "Beginning with the 2020 Presidential Preference Primary, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia shall be conducted via an Optical Scanning Voting System[.]" Ga. Comp. R. & Regs., r. 183-1-12-.01. Thus, the procedures governing precincts using paper ballots, OCGA §§ 21-2-430 to 21-2-440, and voting machines, OCGA §§ 21-2-450 through 21-2-457, appear inapplicable.

"[f]eed ballots from the auxiliary compartment of the ballot box . . . through the tabulator[.]" OCGA § 21-2-485 (2) (A). In sum, "as soon as the polls are closed and the last elector has voted[,]" poll officers must either (1) feed the ballots through the tabulator or (2) seal the ballots for delivery to the central count location where the ballots can be tabulated. See OCGA § 21-2-485.

Contrary to these clear statutory directives, the Hand Count Rule requires poll officers to "unseal and open each scanner ballot box, remove the paper ballots from each ballot box," and then "count the total number of ballots removed from the scanner, sorting into stacks of 50 ballots, continuing until all of the ballots have been counted separately" by three poll officers. Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (5).[27] Additionally, "[t]he decision about when to

_____

[27] Compare OCGA § 21-2-483 (c) ("[T]he seal on each container of ballots shall be inspected, and it shall be certified that the seal has not been broken before the container is opened. The ballots and other contents of the container shall then be removed, and the ballots shall be prepared for processing by the tabulating machines."), with Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (5) (current rule) ("A separate container shall be used for the paper ballots from each ballot box . . . . The container shall be sealed and signed by the poll manager and the same two witnesses such that it cannot be opened without breaking the seal.").

start" the hand counting process "is up to the Poll Manager or Assistant Poll Manager" and may not begin until the day after Election Day. See Ga. Comp. R. & Regs., r. 183-1-12-.12 (a) (5) (a).

The Hand Count Rule is inconsistent with the Election Code because it allows poll officers to delay the tabulation process until the day after Election Day, in contravention of the statute's requirement that tabulation occur "as soon as" the polls are closed. Accordingly, the Hand Count Rule is inconsistent with — and thus unauthorized by — the statute and is invalid at step one.

(iii) *Reasonable Inquiry Rule (Rule 183-1-12-.02 (1) (c.2)).*

The Reasonable Inquiry Rule provides that to "'[c]ertify the results of a primary, election, or runoff,' or words to that effect, means to attest, after reasonable inquiry that the tabulation and canvassing of the election are complete and accurate and that the results are a true and accurate accounting of all votes cast in that election." Ga. Comp. R. & Regs., r. 183-1-12-.02 (1) (c.2). The Plaintiffs argue that directing election officials to engage in a "reasonable inquiry" before certifying election results contradicts

86

OCGA § 21-2-493, which establishes the methods and procedures superintendents must follow when certifying the election results. We agree.

Pursuant to OCGA § 21-2-493, "[t]he superintendent shall, after the close of the polls on the day of a primary or election, . . . publicly commence the computation and canvassing of the returns" and "[u]pon the completion of such computation and canvassing, the superintendent shall tabulate the figures for the entire county or municipality and sign, announce, and attest the same, *as required by this Code section.*" OCGA § 21-2-493 (a) (emphasis added). OCGA § 21-2-493 (b) further requires that, "before computing the votes cast in any precinct," the superintendent "shall compare the registration figure with the certificates returned by the poll officers showing the number of persons who voted in each precinct or the number of ballots cast." If "the total vote returned for any candidate or candidates for the same office or nomination or on any question exceeds the number of electors in such precinct or exceeds the total number of persons who voted in such precinct or the total number of

ballots cast therein," the superintendent shall initiate an investigation. Id. This investigation may "include a recount or recanvass of the votes of that precinct[.]" Id.

The Appellants argue that because OCGA § 21-2-493 does not define the term "certify," the Reasonable Inquiry Rule provides election officials with necessary guidance. But OCGA § 21-2-493 outlines in detail the procedures the superintendent must follow before certifying election results, including comparing the number of registered voters with the number of people who voted or the number of ballots cast and recounting or recanvassing votes. Ultimately, even if the superintendent discovers any error or fraud in the computation of votes, the superintendent "*shall . . .* certify the votes[.]" OCGA § 21-2-493 (i) (emphasis added);[28] see *Hall County Bd. of Tax Assessors v. Westrec Properties, Inc.*, 303 Ga. 69, 75 (3) (809 SE2d 780) (2018) ("The word 'shall' is generally construed as a word of command." (citation and punctuation omitted)). Allowing

---

[28] This does not mean that error or fraud cannot be corrected, but merely that the General Assembly has prescribed means other than the unilateral decision of a local election superintendent.

election officials to delay certification to conduct an undefined "reasonable inquiry" into the validity of the results is incompatible with the clear requirements of OCGA § 21-2-493. And the rule cannot support "uniformity" in election proceedings if it does not define the steps necessary to conduct a "reasonable inquiry." See OCGA § 21-2-31 (1). Thus, the Reasonable Inquiry Rule is inconsistent with — and thus unauthorized by — the statute and fails at step one.

(iv) *The Drop Box ID Rule (Rule 183-1-14-.02 (18)).*

OCGA § 21-2-385 (a) permits an absentee voter's "mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such" voter to mail or deliver the voter's absentee ballot. The statute also permits caregivers of disabled voters and detention facility employees having custody over detained voters to mail or deliver those voters' absentee ballots. See id.

89

The Drop Box ID Rule requires a person delivering, but not mailing, an absentee ballot on behalf of another person to provide a signature and a photo ID and to demonstrate an approved relation to the elector named on the absentee ballot.[29] Ga. Comp. R. & Regs., r. 183-1-14-.02 (18). But nowhere in OCGA § 21-2-385 (a) is the person delivering an absentee ballot required to provide a signature or photo identification. The Drop Box ID Rule, therefore, is

---

[29] Specifically, the Drop Box ID Rule states:

Any absentee ballot drop location, other than the United States Postal Service or authorized and defined drop box under Georgia Law, that receives absentee ballots shall require an absentee ballot form with written documentation, including absentee ballot elector's name, signature and photo ID of the person delivering the absentee ballot, and approved relation to the elector's name on the absentee ballot. An absentee ballot form provided by the Secretary of State shall be completed by the registrar, clerk, deputy, or election official. The form shall serve as a written record of the name of the elector, the name of the person delivering the absentee ballot, the relation to voter, signature of the person depositing the ballot, and type of ID of the person delivering the absentee ballot. The absentee ballot form shall be returned with the absentee ballots and chain of custody forms to the superintendent. Any ballot not included on the recorded absentee ballot form or any ballot delivered without a signed chain of custody shall be considered a provisional absentee ballot. The superintendent shall notify any elector with a provisional ballot immediately and provide information and instructions of how to cure the provisional absentee ballot.

Ga. Comp. R. & Regs., r. 183-1-14-.02 (18).

inconsistent with the statute. The Appellants argue that the signature and photo identification requirements ensure that voters comply with OCGA § 21-2-385 (a) in furtherance of the SEB's authority to "promulgate rules and regulations" to ensure "legality and purity" in all elections. See OCGA § 21-2-31 (1). That might be so. But the rule goes beyond the statute's provisions and invents new requirements. That is not consistent with — and thus not authorized by — the statute. Accordingly, the Drop Box ID Rule is invalid at step one.

(v) *Drop Box Surveillance Rule (Rule 183-1-14-.02 (19)).*

OCGA § 21-2-382 (c) (1) requires the board of registrars or the absentee ballot clerk to "establish at least one drop box as a means for absentee by mail electors to deliver their ballots[.]" Drop boxes are to be located "at the office of the board of registrars or absentee ballot clerk or inside locations at which advance voting . . . is conducted in the applicable primary, election, or runoff and may be open during the hours of advance voting at that location." Id. These drop boxes must "close[] when advance voting is not being conducted

at that location." Id. Drop box locations must also "be under constant surveillance by an election official or his or her designee, law enforcement official, or licensed security guard." Id. The Drop Box Surveillance Rule requires that

> [a]t the close of the polls each day during early voting and after the last voter has cast his or her ballot, the poll officials shall initiate video surveillance and recording of a drop box at any early voting location. Such surveillance shall include visual recording of the drop box if there is one located at that site. Any drop box that is not under constant and direct surveillance shall be locked or removed and prohibited from use. Video surveillance may be live-streamed but must be recorded and will be considered part of the election documents and retained as provided in Code Section 21-2-390.

Ga. Comp. R. & Regs., r. 183-1-14-.02 (19). The Drop Box Surveillance Rule is consistent with OCGA § 21-2-382 (c) (1) because it merely articulates a uniform method of compliance with requirements that the statute itself imposes.

The SEB is authorized to promulgate rules "to obtain uniformity in the practices and proceedings" of election officials, with the important caveat that the rules must be "consistent with" the existing statutory scheme. OCGA § 21-2-31 (1), (2). Although

92

OCGA § 21-2-382 (c) (1) specifies who should be conducting surveillance (i.e., "an election official or his or her designee, law enforcement official, or licensed security guard"), it does not specify how these individuals should monitor drop box locations. The Drop Box Surveillance Rule thus serves a necessary gap-filling function and promotes "uniformity" in election procedure by providing a specific method of compliance with the statute.

The Plaintiffs argue that the rule is inconsistent with OCGA § 21-2-382 (c) (1) because it requires drop boxes not under surveillance to be taken out of use, which is not, in their view, required by the statute. We disagree. OCGA § 21-2-382 (c) (1) requires that drop boxes remain "closed when advance voting is not being conducted" or "when the advance voting period ends"; the rule merely implements that mandate by requiring drop boxes not under constant surveillance to be locked and prohibited from use. Similarly, by requiring video surveillance, the rule provides clarity and uniformity for the implementation of the statute's mandate that

93

drop box locations "be under constant surveillance."[30]

As for step three, OCGA § 21-2-382 (c) (1), as we construe it today, provides sufficient guidelines to cabin the SEB's exercise of rulemaking authority. The statute provides guidelines for where drop box locations should be placed, when drop box locations must close, and who is required to monitor the drop box locations. See OCGA § 21-2-382 (c) (1). Although the statute does not mandate precisely *how* an election official should monitor and restrict access

---

[30] Citing *Ga. Real Estate Comm. v. Accelerated Courses in Real Estate, Inc.*, 234 Ga. 30 (214 SE2d 495) (1975), the Plaintiffs argue that even if the Drop Box Surveillance Rule is consistent with the statute, the Court should strike it down as unreasonable. In *Georgia Real Estate Commission* we held that "the test of validity of an administrative rule is twofold: (1) Is it authorized by statute, and (2) is it reasonable?" Id. at 32 (2) (citing *Eason v. Morrison*, 181 Ga. 322 (182 SE 163) (1935)). But *Eason* did not establish this as a generally applicable requirement for all regulations. See *Cazier v. Ga. Power Co.*, 315 Ga. 587, 590-591 (1) (a) (883 SE2d 517) (2023) (Peterson, P. J., concurring in the denial of certiorari). Rather, *Eason* held that in the unique legal circumstances of the case — where the statute gave the agency "power to adopt all *reasonable* rules and regulations" — that the rule at issue was reasonable (a statutory requirement) and also separately comported with other statutory requirements. 181 Ga. at 322-326 (1) (emphasis added). Thus, *Eason*'s conclusion that the regulation at issue was reasonable was necessarily limited to statutory contexts with similar textual requirements. *Georgia Real Estate Commission*'s statement that all rules must be reasonable to be valid is a misapplication of *Eason*'s narrow holding limited to its specific legal context, and we disapprove that language. Whether an agency regulation that was unreasonable would violate due process is a separate question, and one that is not at issue here.

to drop box locations, with these other guidelines in place, the legislature left that small gap to be filled by the SEB consistent with the statute. See, e.g., *Garrett*, 204 Ga. at 826; *Bohannon*, 185 Ga. at 842-843 (3); *Moseley*, 182 Ga. at 816; *Richter*, 146 Ga. at 220 (2); *Phinizy*, 108 Ga. at 361-363 (1). Accordingly, the statute complies with step three, and the Drop Box Surveillance Rule does not violate the nondelegation doctrine.

***

In sum, of the five rules for which standing has been established, the Reasonable Inquiry Rule, the Hand Count Rule, the Drop Box ID Rule, and the Examination Rule are unauthorized by statute, while the Drop Box Surveillance Rule is valid. There are two rules — the Poll Watcher Rule and the Daily Reporting Rule — that Plaintiffs cannot challenge as voters, community-stakeholders, or organizations. But the trial court also ruled that Hall had standing to challenge the SEB rules as a member of the Chatham County Board of Elections. This conclusion was not based on the correct legal analysis, however, and so we vacate and remand to reconsider

this issue. If the trial court concludes that Hall has standing based on his official capacity, it must then evaluate the two rules we do not consider today — the Daily Reporting Rule and the Poll Watcher Rule — to determine the validity of those rules under the nondelegation framework set forth in this opinion. Accordingly, we affirm in part, reverse in part, vacate in part, and remand with direction.

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Warren, P. J., and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ., concur.*

Decided June 10, 2025.

Election. Fulton Superior Court. Before Judge Cox.

*Chalmers Adams Backer & Kaufman, Alex B. Kaufman, Kevin T. Kucharz; Hall Booth Smith, William B. Carver, Sr.; Consovoy McCarthy, Gilbert C. Dickey, Conor D. Woodfin*, for appellants (case no. S25A0362).

*Clark Hill, Bryan P. Tyson, Diane F. LaRoss, Bryan F. Jacoutot*, for appellant (case no. S25A0490).

*Bradley Arant Boult Cummings, Christopher S. Anulewicz, Jonathan R. DeLuca, Marc J. Ayers; Cory H. Isaacson, Caitlin F. May, Akiva H. Freidlin; Theresa J. Lee, Sophia L. Lakin; Gerald R. Weber, Jr.; Morgan Lewis & Bockius, Raechel K. Kummer, Katherine A. Vaky, Carolyn Welshhans*, for appellees.

*The Bullard Firm, Brandon A. Bullard; David E. Oles, Sr.; Page Scrantom Sprouse Tucker & Ford, James C. Clark, Jr., Thomas F. Gristina; Caplan Cobb, Michael A. Caplan, T. Brandon Waddell, Ashley C. Brown; Haynie Litchfield & White, Daniel W. White, William A. Pinto, Jr.; Elaine Poon; Kastorf Law, Kurt G. Kastorf; The Barnes Law Group, Charles C. Bailey; Rouse & Copeland, Amy L. Copeland; Ballard Spahr, Keisha O. Coleman; Moore Legal Services, Jennifer E. Moore; Manatt Phelps & Phillips, Joanna S. McCallum; Wilmer Cutler Pickering Hale & Dorr, Sharon K. Hogue, Thomas G. Sprankling, Alex W. Miller, Daniel S. Volchok, Anuj Dixit, Seth P. Waxman, Felicia H. Ellsworth*, amici curiae.