**THIRD DIVISION
DOYLE, P. J.,
MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**September 19, 2025**

# In the Court of Appeals of Georgia

A25A0831. DEKALB COUNTY REPUBLICAN PARTY, INC. v. RAFFENSPERGER.

PADGETT, Judge.

The DeKalb County Republican Party, Inc. (the "County Party") appeals from the dismissal of its application for writ of mandamus against Secretary of State Raffensperger (the "Secretary"). In its application, the County Party sought to compel the Secretary to comply with what it contends is the Secretary's ongoing duty under OCGA § 21-2-300 (a) to ensure that Georgia's uniform electronic voting system complies with certification standards of the United States Election Assistance Commission ("EAC"). For the following reasons, we affirm the trial court's dismissal of the application for writ of mandamus.

1. *Factual and Procedural Background*

In 2019, the State of Georgia, pursuant to statute, moved from conducting elections using a "direct recording electronic" voting system[1] to a uniform voting system that produced paper ballots marked by an electronic ballot marking device, which would display voters' choices in a format readable by voters, and that would be scanned and tabulated by ballot scanners. See Ga. L. 2019, Act 24, § 18; see generally *Secure, Accessible & Fair Elections (SAFE) Commission Report.*[2] As part of the transition, the General Assembly imposed, in relevant part, two statutory requirements for the selection of the new voting system. Specifically, under the newly-revised OCGA § 21-2-300 (a) (3), any new voting system consisting of electronic ballot markers and ballot scanners was required to be "certified by the [EAC] prior to purchase, lease, or acquisition" by the State. See OCGA § 21-2-300 (a) (3). Additionally, under OCGA § 21-2-300 (a) (2), the Secretary was to certify the voting system as "safe and practicable for use," before it was to be deployed for use in all federal, state, and

---

[1] A "direct recording electronic" voting system means "a computer driven unit for casting and counting votes on which an elector touches a video screen or a button adjacent to a video screen to cast his or her vote." OCGA § 21-2-2 (4.1).

[2] https://sos.ga.gov/sites/default/files/2022-03/safe_commission_report_final_1-10-18.pdf (Jan. 10, 2019) (last visited Sept. 10, 2025) .

county elections within the State. See OCGA § 21-2-300 (a) (2). The particular voting system selected by the Secretary was certified by the EAC on January 30, 2019, prior to the State's purchase of the system in July 2019. Around the same time the State purchased the voting system, the Secretary certified it as "safe and practicable for use" in advance of it being deployed for use in elections.

In August 2024, the County Party sought the extraordinary remedy of a writ of mandamus, asking the trial court to compel the Secretary to comply with OCGA § 21-2-300 (a). Specifically, the County Party claimed that the Secretary's duties in OCGA § 21-2-300 (a) (2) and (3) were not one-time obligations to be fulfilled prior to purchase and deployment of the voting system. Rather, the County Party asserted that those statutory provisions imposed an ongoing duty on the Secretary to maintain EAC certification of the uniform voting system used throughout the State. . The County Party claimed that because EAC certification standards directed that the voting system store encryption keys in compliance with Voluntary Voting System Guidelines ("VVSG"),[3] the Secretary had an ongoing duty to certify that the system complied

---

[3] The VVSG "are a set of specifications and requirements against which voting systems can be tested to determine if they meet required standards," and were developed by the EAC pursuant to the federal Help America Vote Act of 2002, 52 USC §§ 20901 et seq. See *Voluntary Voting System Guidelines*, U. S. Election

with VVSG requirements related to encryption key storage. The County Party alleged the Secretary failed to fulfill this ongoing duty because multiple county voting systems stored encryption keys in unprotected plain text. The County Party further alleged that the Secretary's ongoing failure to bring the state's voting system into compliance with those requirements constituted a gross abuse of his discretion.

The Secretary moved to dismiss the application, arguing that the statewide voting system complied with the two statutory certification requirements set forth in OCGA § 21-2-300 (a), and that the County Party could not meet its burden for mandamus relief. The trial court declined to issue a pretrial ruling on the motion. After completion of the County Party's case at the bench trial, however, the trial court dismissed the application,[4] finding that according to the plain language of the statute,

---

Assistance Commission, eac.gov/voting-equipment/voluntary-voting-system-guidelines (last visited Sept. 10, 2025).

[4] At the close of the County Party's case, the Secretary renewed his motion to dismiss and moved for a directed verdict. Because the parties waived their right to a jury trial and thus no verdict would result, the correct procedural form of the Secretary's dispositive motion was involuntary dismissal under OCGA § 9-11-41 (b). See *Meacham v. Franklin-Heard County Water Auth.*, 302 Ga. App. 69, 74 (1) (690 SE2d 186) (2009) ("A motion for a directed verdict in a non-jury case will be construed as one for involuntary dismissal under OCGA § 9-11-41 (b)[.]") (citation omitted).

the Secretary had only a one-time, temporal duty to ensure EAC certification "prior to [the] purchase, lease, or acquisition" of the voting system and a similar one-time duty to certify that system as "safe and practicable for use" in advance of the system being used in elections. Thus, having determined the plain language of the statute did not impose an ongoing duty on the Secretary related to the certifications required by OCGA § 21-2-300 (a) (2) and (3), the trial court found there was no clear legal right to the mandamus relief sought by the County Party and that its application must be dismissed. This appeal followed.[5]

On appeal from a nonjury trial, the trial court's ruling on a motion for involuntary dismissal under OCGA § 9-11-41 (b) will not be disturbed if there is "any evidence" to support it. *East Ga. Land and Dev. Co., LLC v. Baker*, 286 Ga. 551, 554 (3) (690 SE2d 145) (2010) (citation and punctuation omitted). However, when an appeal from a grant or denial of a motion to dismiss presents a question of law, we

---

[5] The County Party initially filed a notice of appeal and an emergency motion for relief pending appeal directed to the Supreme Court of Georgia. However, because the Supreme Court determined the matter provided no basis for its jurisdiction, see Ga. Const. of 1983, Art. VI, Sec. VI, Par. II-III; OCGA § 15-3-3.1, it transferred the matter to this Court. This Court subsequently denied the emergency motion, finding that the petition failed to establish that invocation of this Court's Rule 40 (b) jurisdiction was warranted.

review the trial court's decision de novo. *City of Sandy Springs Bd. of Appeals v. Traton Homes, LLC*, 341 Ga. App. 551, 552 (801 SE2d 599) (2017).

## 2. *Constitutional Standing*

Although the parties joined the issue of standing below, the Secretary did not argue it as a basis for dismissal and the trial court, in its well-reasoned opinion, did not undertake to rule on it. However, both the Secretary and the County Party have briefed the issue before this Court. As it is incumbent upon this Court to inquire into jurisdiction, we must address the issue of whether the County Party has standing to seek mandamus relief against the Secretary related to his duties under OCGA § 21-2-300 (a). See *Cobb County v. Floam*, 319 Ga. 89, 91 (1) (901 SE2d 512) (2024) ("Standing is a jurisdictional prerequisite necessary to invoke a court's judicial power under the Georgia Constitution."(citing Ga. Const. of 1983, Art. VI, Sec. I, Par. I.)); *Abushmais v. Erby*, 282 Ga. 619, 622 (3) (652 SE2d 549) (2007) (lack of subject matter jurisdiction "cannot be waived and may be raised at any time either in the trial court, in a collateral attack on a judgment, or in an appeal") (citation and punctuation omitted).

In its application for mandamus relief, the County Party alleges that it is a domestic non-profit corporation whose purpose, according to its bylaws, is to promote "policies adopted by the Georgia Republican Party" and "further the aims of the National Republican Party platform." It further alleges that it

> aims to support and ensure the election of Republican candidates in free and fair elections conducted according to law. As a membership organization whose members are candidates and voters in elections in Georgia, the [County Party] is entitled to the due and proper enforcement and application of Georgia's Election Code, and to the conduct of elections on voting systems that comply with the requirements of Georgia law.

As a result, the County Party claims it has organizational standing to bring the action because the State's use of a voting system that does not comply with what it maintains are cyber-security requirements of state law "directly affects its organizational interests and purposes and as a community stakeholder as contemplated by OCGA § 9-6-24." In the alternative, it claims to have associational standing on behalf of its members who are registered voters and residents of DeKalb County, as well as present or future candidates for elected office, and whose interests the County Party alleges

7

were "cognizably injured" by the State mandating use of a voting system it claims did not comply with Georgia law.[6]

In recent decisions considering these varieties of standing, our Supreme Court has gone to great lengths to clarify and provide "course corrections" to our standing doctrine. See *Republican Nat. Committee v. Eternal Vigilance Action, Inc.*, 321 Ga. 771, 776 (2) (a) (917 SE2d 125) (2025) (describing *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39 (880 SE2d 168) (2022) ("*SCV*"), and *Wasserman v. Franklin County*, 320 Ga. 624 (911 SE2d 583) (2025), as "course corrections"). Those course corrections remind us that:

> Under the Judicial Power Paragraph of the Georgia Constitution, Georgia courts have the power to resolve only genuine controversies. For a genuine controversy to exist, and thereby invoke the State's judicial power, a plaintiff must have standing to sue. This is a jurisdictional

---

[6] In further support of its allegation of associational standing, the County Party claims that its individual members would otherwise have standing to bring the action themselves; that the interests the County Party seeks to protect were germane to its organizational purposes of "preserving liberty under law, including through the election to office of Republican candidates in free and fair elections conducted according to law"; and that neither the claim asserted nor the relief requested requires the participation of its individual members in the action.

requirement, mandating that a plaintiff show that he has a legal right at stake that requires adjudication to protect it. . . . A plaintiff must assert the violation of his own rights and cannot merely vindicate the rights of another.

*Eternal Vigilance*, 321 Ga. at 775 (2) (citations and punctuation omitted; emphasis in original); see *Wasserman*, 320 Ga. at 624 ("a plaintiff must assert at a minimum that she has a legal right at stake, because without a right at stake, there is no actual controversy" for a court to resolve). As the Supreme Court repeatedly has emphasized in these decisions, the requirement that a plaintiff assert the violation of his own legal rights to maintain an action in Georgia courts is "the bedrock requirement for invoking the judicial power granted by the Georgia Constitution." *Eternal Vigilance*, 321 Ga. at 775 (2) (quoting *Wasserman*, 320 Ga. at 640 (II) (A) (2)). Our courts often describe this constitutional requirement as necessitating a plaintiff's assertion of "cognizable injury" or "legal injury," which terms, the Supreme Court has explained, are simply "shorthand for the basic standing rule that . . . a plaintiff must assert a violation of h[is] legal rights," as distinct from an "injury in fact" only. *Wasserman*, 320 Ga. at 639 (II) (A) (1) (b) n.8; see *Eternal Vigilance*, 321 Ga. at 776-777 (2) (a) (the proper focus of an inquiry into standing is on "vindicating the legal rights

9

of the parties, rather than on addressing mere factual harms"). Thus, these decisions instruct that any theory of organizational standing based solely on factual harms, unmoored from a violation of an organization's legal rights, "has no place in our standing doctrine." *Eternal Vigilance*, 321 Ga. at 777 (2) (a).

Guided by these decisions and this bedrock constitutional principle, we address each theory of standing proffered by the County Party.

(a) *Associational Standing*

We first dispense with the County Party's assertion of associational standing. Associational standing, which has been described as a less-demanding version of federal third-party standing, allows an organization or association to sue to vindicate the rights of its members where: (1) its members would otherwise have standing to sue on their own; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested required the participation of the individual members in the litigation. See *Eternal Vigilance*, 321 Ga. at 777-778 (2) (b) (citing *Aldridge v. Ga. Hospitality & Travel Assn.*, 251 Ga. 234 (304 SE2d 708) (1983)). While the County Party acknowledged in its briefing to this Court that our Supreme Court's decision in *Wasserman* likely signaled the imminent demise

10

of associational standing, its formal excision from our standing doctrine had not yet occurred. See *Wasserman*, 320 Ga. at 648-649 (II) (B) (2) (rejecting federal third-party standing doctrine that allowed "a plaintiff without any right at stake to assert the rights of a party not before the court," as incompatible with Georgia's constitutional limit on judicial power and overruling *Feminist Women's Health Center v. Burgess*, 282 Ga. 433 (651 SE2d 36) (2007)). However, the Supreme Court's recent decision in *Eternal Vigilance* changed that, jettisoning the theory of associational standing from our law as "not only incompatible with our longstanding constitutional standing rule," but also as having "wrongly expanded the power of Georgia courts to resolve certain cases." *Eternal Vigilance*, 321 Ga. at 780 (2) (b).[7] As a result, the plaintiffs-intervenors there — the Georgia State Conference of the NAACP and the Georgia Coalition for the People's Agenda, Inc. — could not assert associational standing in order to challenge a rule of the State Elections Board as contrary to the Election Code and seek to enjoin the State from applying the rule. Id. at 773-774 (1), 777-779 (2) (b). The same result must obtain here; the County Party may not rely on the theory of associational

---

[7] In doing so, the Supreme Court overruled its decision in *Aldridge v. Ga. Hosp. & Travel Assn.*, 251 Ga. 234 (304 SE2d 708) (1983), and other decisions to the extent they recognized federal associational standing as viable under the Georgia Constitution. *Eternal Vigilance*, 321 Ga. at 780 (2) (b).

standing in its effort to compel the Secretary to act in the manner it contends is required by the Election Code.

(b) *Community-Stakeholder Standing*

The County Party also argues that as an organization, it has what our Supreme Court has denominated as community-stakeholder standing, a theory of standing that is, itself, codified within the mandamus statute related to enforcement of public rights. See *SCV*, 315 Ga. at 58 (2) (c) (ii).[8] On appeal, the County Party relies on our Supreme Court's decision in *SCV* to argue it has standing under the community-stakeholder doctrine to pursue mandamus against the Secretary because it "has an interest in and right to the Secretary performing his duty to ensure that elections are conducted securely, in compliance with Georgia law," and that the Secretary's breach of this duty "affected" and "caused legally cognizable injury" to its organizational interests in "election integrity" and "electing Republicans in clean elections." It argues, without citation to authority, that while our Supreme Court has recognized

---

[8] The public rights mandamus statute provides: "[w]here the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it shall be sufficient that a plaintiff is interested in having the laws executed and the duty in question enforced." Id. (citing OCGA § 9-6-24).

individual voters as having community-stakeholder standing to seek mandamus relief related to election matters, "community stakeholder standing applies equally to organizational plaintiffs[,]" and that "[n]either *SCV* nor any other case establishes a per se rule that would exclude a county-level political party from community stakeholder standing, especially in the election context."

We decline to adopt the County Party's argument that it has community-stakeholder standing to pursue mandamus relief against the Secretary related to his duties under OCGA § 21-2-300 (a). A review of the doctrine's origins and decisions of our Supreme Court interpreting its meaning, in light of the bedrock constitutional limit on judicial power that the Supreme Court has painstakingly detailed in recent decisions, guides our analysis.

### (i) *Origins and Current Precedential Limits*

As the Supreme Court recounted in *Eternal Vigilance*,

> The community-stakeholder standing rule traces its roots to taxpayer suits against municipal corporations . . . based on the corporate form of the cities; this Court equated municipal taxpayers to private shareholders of private corporations and thus concluded that a taxpayer should have the same ability as private shareholders to sue the corporation to prevent illegal acts that would cause damage to the corporation in which the

13

taxpayer was a stakeholder. Specifically, in *Keen v. Mayor and Council of Waycross*, 101 Ga. 588 (29 SE 42) (1897), this Court reasoned that taxpayers of a municipality and private corporation shareholders were similarly situated and were similarly interested in preserving the corpus, such that taxpayers suing their city should have the same ability (standing) as private shareholders suing their company had to protect those interests and prevent any illegal acts that would otherwise cause loss and expense that taxpayers would ultimately bear.

*Eternal Vigilance*, 321 Ga. at 782 (2) (c) (citations and punctuation omitted).[9] Thus, the Court acknowledged that

Georgia law has long provided that when a local government owes a legal duty to community stakeholders (i.e., citizens, voters, residents, or taxpayers), those stakeholders have a legal right for the local government to fulfill that duty. The violation of that legal right gives standing to a stakeholder, even if the stakeholder in the case neither faces nor has suffered any individualized injury distinct from that to the community at large.

---

[9] The Supreme Court "almost immediately" extended this rationale of standing to suits against county governments, id. at 782 (2) (c) (citing *Koger v. Hunter*, 102 Ga. 76, 79-80 (29 SE 141) (1897)), and as a result, the availability of community-stakeholder standing in suits against municipal and county governments "became part of a consistent and definitive understanding of Georgia's judicial power that was eventually incorporated into the 1983 Constitution's Judicial Power Paragraph." Id. at 782 (2) (c) (citing *SCV*, 315 Ga. at 55-61 (2) (c)).

Id. at 781 (2) (c) (citing *SCV*, 315 Ga. at 53 (2) (b)).

Critically, however, our Supreme Court has yet to sanction use of community-stakeholder standing in the context of a suit against a state agency or official, and in fact, has explicitly declined to extend community-stakeholder standing to organizations seeking to challenge state-issued election rules. See *Eternal Vigilance*, 321 Ga. at 781-784 (3) (c). The plaintiff organization in *Eternal Vigilance*, like the County Party here, was a domestic nonprofit corporation focused on election policy. Id. at 772-773 (1). That nonprofit, along with two individual voters, sought injunctive relief against the State and a declaration that rules adopted by the State Elections Board violated the Election Code. Id. at 773 (1). In rejecting all plaintiffs' claims of community-stakeholder standing, the Supreme Court stressed that its holding in *SCV* was limited to suits against local governments, and refused to endorse plaintiffs' contention that because they were "seeking to enforce a public duty by ensuring that … election officials will follow the law," they had community-stakeholder standing.[10]

---

[10] However, the Court did conclude that the two individual plaintiffs had standing as voters (known as "voter standing") to challenge certain of the state rules. Id. at 784 (2) (d) ("Because voting is a private right, a voter has standing to challenge a rule on the basis it violates his right to vote, which includes the right to have his vote

Id. at 781-782 (3) (c) ("Neither *SCV* nor *Floam* held that the community stakeholder

theory of standing applied to suits against the State or its agencies."); see also *Floam*,

319 Ga. at 92-93 (1) (noting that the separation of powers principle is the animating

reason for requiring an individualized injury, as opposed to an injury shared by

relevant community stakeholders, when challenging state legislative action; "a county

commission is not a part of State government, much less a branch co-equal with the

State's judicial branch."). The Supreme Court, again paying heed to the shareholder

derivative rationale underlying the doctrine, found that the rationale did not support

extending community-stakeholder standing to suits against the State,[11] and thus, held

counted."); accord *Barrow v. Raffensperger*, 308 Ga. 660, 667 (2) (b) (842 SE2d 884) (2020) (voter had standing to bring mandamus action against the Secretary of State challenging the latter's decision to cancel an election).

[11] The Court did acknowledge that the principle now known as community-stakeholder standing "appears to have been applied against the State in two instances," but noted that those cases applied the doctrine "without engaging in any reasoning" and remain "clear outliers in the context of challenges to State actions[.]" Id. at 783 (2) (c) (citing *Arneson v. Bd. of Trustees of Employees' Retirement Sys. of Ga.*, 257 Ga. 579, 579-580 (1) - (3) (361 SE2d 805) (1987), and *Head v. Browning*, 215 Ga. 263, 266-267 (2) (109 SE2d 798) (1959)). Notably, the decision in *Head* that our Supreme Court has now expressly disapproved of involved individual city residents and taxpayers relying on the public rights mandamus statute to establish standing in their action to enjoin the State Revenue Commissioner from issuing a state liquor license. See *Head*, 215 Ga. at 263, 265-267 (2).

that the plaintiffs had to "assert the violation of [an] individual right, as opposed to a community-stakeholder right, to challenge actions by the State." *Eternal Vigilance*, 321 Ga. at 783 (2) (c).[12]

(ii) *Scope of Community-Stakeholder Standing within OCGA § 9-6-24*

Setting aside, for the moment, the precedential limits discussed, supra, that we view as precluding the County Party's use of community-stakeholder standing to challenge the Secretary's alleged non-performance of duties set out by state statute, additional limits inherent in the doctrine, connected to the identity of the community to whom the Secretary's duty is owed and the concomitant injury shared among community members for breach of that duty, likewise lead us to conclude that the County Party does not have community-stakeholder standing to bring this action against the Secretary under OCGA § 9-6-24.

---

[12] The Supreme Court did not foreclose, nor do we with this decision, the possibility that an individual or even an organization might establish community-stakeholder standing, properly understood, in challenging certain state actions that are aligned with the rationale for such standing. See *Eternal Vigilance*, 321 Ga. at 783 (2) (c) n.8. The Court was clear, however, that unlike community-stakeholder standing for enforcement of public duties against local governments, any application of the doctrine in suits against the State has not been included within the "consistent and definitive understanding of Georgia's judicial power." Id. at 782 (2) (c).

Again stepping back to the common law and its use of the writ of mandamus to enforce public rights and duties that affected the "whole community," the Supreme Court in *SCV* observed that "[n]ot every person could bring a case to vindicate those public rights[.]" *SCV*, 315 Ga. at 48 (2) (a). That is, while the historical use of the writ indicated that litigant need not have suffered any "unique, individualized harm" in order to seek mandamus, the universe of putative litigants to whom the writ was available was not limitless. Id. at 49 (2) (a). And as carried forward within our Constitution, our Supreme Court has distilled that limitation as follows: to invoke our state's judicial power by way of a mandamus or similar statute, "there must be some injury, but in most local government cases involving public rights, such injury need not be unique to the plaintiff when a member of the *relevant* community seeks relief." Id. (emphasis supplied). For, if a litigant seeking to enforce a public right is not a member of the relevant community to whom the public duty is owed, then that litigant is attempting to vindicate the rights of others, an action not permitted by our Constitution. See id. at 50 (2) (b) ("For an actual controversy to exist," as is required for the exercise of the judicial power, "a party must have some right at stake that requires adjudication to protect it."); *Eternal Vigilance*, 321 Ga. at 771 ("[w]e reiterate

once again that the Georgia Constitution allows us to decide only claims brought by parties who have asserted . . . their own rights"); *Wasserman*, 320 Ga. at 636 (II) (A) (1) (b) (whether adjudicating private rights or public rights, "plaintiffs have been required, at a minimum, to assert a violation of *their own* legal rights" to maintain an action in our courts) (emphasis in original).

The inquiry into community-stakeholder standing to pursue mandamus thus requires that we identify the relevant community to whom the legal duty is owed, for that is the community that has the capacity to incur cognizable injury when the governmental authority fails to fulfill the duty; that is, the community whose own legal rights will be affected by the performance or non-performance of the duty. See *Wasserman*, 320 Ga. at 635 (II) (A) (1) (a) (ii), (b) (noting that the well-established backdrop against which our Constitution granted the judicial power required that a person could not bring an action to vindicate a public right "without at least being a member of the public who shared in that right — that is, without asserting that her own shared public rights were in dispute."). Once we identify the relevant community to whom the duty is owed and whose members' legal rights are imperiled by a failure to perform the duty, our determination of whether a plaintiff — be it an individual or

an organization[13] — has community-stakeholder standing turns on whether that plaintiff belongs to that relevant community. See *SCV*, 315 Ga. at 54 (2) (c) (explaining that in cases involving a public right, the injury required to establish standing may be one that affects the public at large and "is not unique to the plaintiff," but the plaintiff still must be among the public class that is owed the duty and thus shares the injury). This is because the mere existence or even violation of a duty, without more, cannot provide cognizable injury to establish community-stakeholder standing consistent with the judicial power granted by our Constitution. See *SCV*, 315 Ga. at 64 (2) (d) n.21 ("[A] statute can create a legal duty, the violation of which can be a cognizable injury, but the duty must be owed the plaintiff. The creation of a duty generally does not, alone, create the cognizable injury.")

The fate of the plaintiff organizations' claims of community-stakeholder standing in *SCV* is instructive on this analytical front. There, the Supreme Court considered community-stakeholder standing in the context of a local government's alleged violation of a statute related to preservation of historical monuments. *SCV*, 315

---

[13] See *Eternal Vigilance*, 321 Ga. at 777 (2) (a) (an organization has standing "in its own right if it meets the same standing test applicable to individuals") (citation and punctuation omitted).

Ga. at 60-67 (c) (iii) - (d) (ii). While the local government's duty within that statute was different than the Secretary's duties within the Election Code here, the procedural portion of that statute was not functionally dissimilar from the public rights mandamus statute. The *SCV* statute authorized "any person, group, or legal entity" to bring a cause of action against any state or local governmental entity that relocated or removed certain historic monuments from public property. See *SCV*, 315 Ga. at 40-41 (1) (a) (citing OCGA § 50-3-1 (b)).[14] Following votes by two county boards of commissioners to remove such monuments from public property, an individual plaintiff and various Sons of Confederate Veterans' organizational entities sued the county boards for damages and injunctive relief, as permitted by the statute. Id. at 41 (1) (b). Both the individual plaintiff and the organizational entities alleged that the removal of the monuments in violation of the statute would cause injury to their "rights and dignity," and that the statute itself conferred standing. Id. at 41-42 (1) (b). In finding that the organizational entities lacked community-stakeholder standing, the

---

[14] Indeed, the statute at issue "imposed a new duty on government agencies, and its plain text provided a cause of action to any person, group, or legal entity to enforce that duty." Id. at 43 (2) (citation and punctuation omitted). The statute did not require any plaintiff to have suffered any particular injury, and thus, the Supreme Court's task was to determine whether constitutional standing required more in order for the plaintiffs to invoke the judicial power. See id.

Supreme Court noted that because the organizations did not have a stake as citizens, residents, or taxpayers in the corpus of the local government, they were not owed the duty to abide by the monument preservation statute and thus, could not sustain any cognizable injury as a result of its violation. *SCV*, 315 Ga. at 66-67 (2) (d) (ii) ("our case law makes clear that . . . [a] violation of that duty does not injure people to whom the local government owes no duty.").

Here, the duties at issue are the Secretary's duty to certify a voting system as compliant with EAC certification standards "prior to purchase, lease, or acquisition" by the State and to certify the system as "safe and practicable" before its use in elections. See OCGA § 21-2-300 (a) (2) and (3). In their broadest reach, these duties are owed to voters, and arguably, the population to whom the Secretary owes these duties is narrower, potentially reaching only those individuals or entities charged with administering elections.[15] There is no allegation or proof here that the County Party, as a nonprofit corporation, is itself a voter or has the legal authority and responsibility to administer elections. It may have, as alleged, a sincerely held policy interest in cyber-security as it relates to voting systems, but no legal right flows from that interest

---

[15] See OCGA § 21-2-2 (4) (custodians), (11) (managers), (26) (poll officers), and (35) (superintendents).

22

and as a result, the question of whether the Secretary should be compelled to fulfill his statutory duties neither protects nor violates any legal rights of the County Party. As such, the County Party cannot establish community-stakeholder standing to pursue mandamus relief related to the Secretary's alleged non-performance of his statutory duties. See *SCV*, 315 Ga. at 67 (2) (d) (ii); cf. *Barrow v. Raffensperger*, 380 Ga. 660, 667 (2) (b) (842 SE2d 884) (2020) (the Secretary's duty to conduct a legally required election is owed to voters, and thus, a voter has standing to pursue mandamus); see also *Bartlett v. Caldwell*, 265 Ga. 52, 53 (452 SE2d 744) (1995) (although a citizen may have an interest in crime being prosecuted, that citizen "does not have a judicially cognizable interest in the prosecution or nonprosecution of another," and thus, lacks standing to pursue mandamus relief against a prosecuting authority when that citizen is not being prosecuted or threatened with prosecution); *Adams v. Ga. Dept. of Corrections*, 274 Ga. 461, 461-462 (553 SE2d 798) (2001) (rejecting petitioners' arguments that, as citizens, petitioners had standing to seek mandamus against state actors, in part, because the constitutional duty to refrain from cruel and unusual punishment was owed only to those who were charged with or convicted of a capital crime, which community of potential litigants petitioners were not members).

23

To accept the County Party's argument that it — as an organization with no right to vote in county, state, or federal elections — has community-stakeholder standing based on its factual, policy interest in "election integrity" and "electing Republicans in clean elections" would be to cast aside any meaningful constraint on the judicial power. Hewing closely to what we view as the essential instruction of the Supreme Court's "course correcting" decisions, we decline to extend the doctrine of community-stakeholder standing to an organization seeking mandamus against a state actor to compel performance of a duty prescribed by the state legislative branch, where the organization's own legal rights may be neither protected nor violated by the feasance, nonfeasance, or malfeasance of that duty. In doing so, we are mindful of the Supreme Court's recognition that certain decisional law in the past has "wrongly expanded the power of Georgia courts to resolve certain cases" beyond "the clear and time-tested rule that a party must assert his own rights to maintain an action," *Eternal Vigilance*, 321 Ga. at 780 (2) (b) (citation and punctuation omitted), and we are careful not to resurrect a similarly wrongful expansion of the judicial power in the name of

community-stakeholder standing or an arguable statutory-conferral of standing by way of mandamus.[16]

Neither the Georgia Constitution nor precedent of our Supreme Court permits the conferral of standing that the County Party argues here. Accordingly, we conclude that because the County Party has failed to allege injury to its own legal right, it lacks standing to seek mandamus relief against the Secretary related to his duties under OCGA § 21-2-300 (a). Following the rationale that a judgment right for any reason will be affirmed, we thus affirm the trial court's dismissal of the County Party's

---

[16] Because the requirement of cognizable injury is of "constitutional dimension, the General Assembly lacks the authority to set it aside by statute." *SCV*, 315 Ga. at 62 (2) (c) (iii). Thus, we "must read the statute consistent with the constitutional standing requirements," id. at 64 (2) (d), and interpret the public rights mandamus statute as requiring more than a mere factual or policy interest in having the duty at issue performed. Consistent with the constitutional grant of the judicial power, we read the phrase "no legal *or* special interest need be shown" within OCGA § 9-6-24 (emphasis added) as "legal" and "special" being equivalent, or substitutive of each other, and in that manner, modifying "interest." Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/or* (last visited Sept. 10, 2025). We view this interpretation as a reiteration of the rule that in seeking mandamus to vindicate a public right, the plaintiff need not show an individualized injury to a right that is distinct from the injury shared by the remainder of the relevant community of which the plaintiff is a member. See generally *SCV*, 315 Ga. at 64 (2) (d) ("Under the canon of constitutional doubt, if a statute is susceptible of more than one meaning, one of which is constitutional and the other not, we interpret the statute as being consistent with the Constitution.") (citation and punctuation omitted).

application for writ of mandamus. See *Police Benevolent Assn. of Savannah v. Brown*, 268 Ga. 26, 28 (2) (486 SE2d 28) (1997) (finding, on appeal, that the organizational plaintiff lacked standing to seek writ of mandamus, and affirming the trial court's order dismissing the petition as filed by all plaintiffs, based upon principles not relied upon by the trial court, because "where the trial court is right for any reason, its judgment will be affirmed") (citation and punctuation omitted).[17]

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*

---

[17] In light of our holding that the County Party lacks standing to pursue mandamus relief against the Secretary in connection with his duties under OCGA § 21-2-300 (a) (2) and (3) and that the trial court therefore did not err in dismissing the application, we do not reach the County Party's enumerations of error related to the trial court's interpretation of certification requirements under OCGA § 21-2-300 (a) (2) and (3), or whether the Secretary grossly abused his discretion by not reexamining the voting system's compliance with state and federal law after certifications occurred under OCGA § 21-2-300 (a) (2) and (3).